**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                              )
CURTIS MITCHELL              )
           Petitioner,        )
                              )
v.                            )        Civil Action No. 04-10539-RGS
                              )
TIMOTHY HALL                 )
           Respondent.        )
_____)

**RESPONDENT'S MEMORANDUM IN OPPOSITION**
**TO PETITION FOR HABEAS CORPUS**

This memorandum of law is submitted in opposition to the petition for a writ of

habeas corpus filed by Curtis Mitchell ("the petitioner").  As argued in this memorandum,

the petition must be denied where the petitioner cannot demonstrate that the state court's

adjudication of his claim on the merits resulted in a decision that involved an unreasonable

application of clearly established Federal law, as determined by the Supreme Court of the

United States, or an unreasonable determination of the facts in light of the evidence

presented in the state court.

**PRIOR PROCEEDINGS**

On September 19, 1996, a Bristol County grand jury indicted the petitioner for the

June 14, 1996, murders of David Allen and Sonya Shurtliff (S.A. 1: R.A. 6).[1]  On December

9, 1998 trial commenced before a jury (Brassard, J., presiding).  During a side bar

conference on the sixth day of trial, defense counsel advised the court that he could

not aid in the presentation of the petitioner's testimony consistent with Mass. R. Prof.

Conduct 3.3(e), which concerns an attorney's ethical obligation with respect to a

_____

[1]  The respondent's supplemental answer will be referred to as (S.A.--).

defendant's false testimony (Tr. VI/5-19).  Following a further discussion, Judge Brassard directed counsel to remain standing while the petitioner testified in narrative form and to assist during the petitioner's cross-examination question by question (Tr. VI/-13-14, S.A. 1: R.A. 79-80).

On December 18, 1998, the jury found the petitioner guilty of first degree murder on both indictments on the theories of deliberate premeditation and extreme atrocity or cruelty (S.A. 1: R.A. 9).  The court sentenced the petitioner to concurrent mandatory terms of life imprisonment (S.A. 1: R.A. 9).

On September 11, 2000, the petitioner filed a motion for new trial, alleging trial counsel's improper invocation of Rule 3.3(e) and various claims of ineffective assistance of counsel (S.A. 1: R.A. 14, 20-32).   On December 18, 2000, after a non-evidentiary hearing held on October 24, 2000, Judge Brassard denied the motion in a written memorandum of decision (S.A. 1: R.A. 14, 105-160).  The petitioner consolidated his direct appeal with his appeal from the denial of his motion for new trial, and the Supreme Judicial affirmed the convictions on January 24, 2003.  *Commonwealth v. Mitchell*, 438 Mass. 535, 781 N.E.2d 1237 (2003) (S.A. 3).

On March 15, 2004, the petitioner filed a petition for writ of habeas corpus in this court.  On April 9, 2004, the respondent filed an Answer and Supplemental Answer.

## STATEMENT OF FACTS

The Massachusetts Supreme Judicial Court's recitation of the facts of the petitioner's crimes is entitled to the presumption of correctness under 28 U.S.C. §2254(e)(1).  *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*,

265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1sr Cir. 2000).  The

AEDPA presumption of correctness applies to all "basic, primary, or historical facts"

underlying the state court's conclusion.   *Gunter v. Maloney*, 291 F.3d at 76; *Sanna v.*

*DiPaolo*, 265 F.3d at 7.   In addition, the presumption of correctness extends to factual

determinations made by both state trial and appellate courts.  *Rashad v. Walsh*, 300 F.3d

27, 34 (1st Cir. 2002), and to any factual findings implicit in the state court's ruling.

*LaVallee v. Delle Rose*, 410 U.S. 690, 692 (1972); *Weeks v. Snyder*, 219 F.3d 245, 258

(3d Cir.), *cert. denied*, 531 U.S. 1003 (2000).   As the First Circuit has noted, "[a] habeas

petitioner must clear a high hurdle before a federal court will set aside any of the state's

factual findings."  *Mastracchio v. Vose*, 274 F.3 590, 598 (1st Cir. 2001).   The petitioner

has the burden of rebutting the presumption of correctness by clear and convincing

evidence.  28 U.S.C. § 2254 (e)(1).

The Supreme Judicial Court found the following facts concerning the petitioner's

crimes:

> The victims, Sonya Shurtliff and David Allen, were murdered in the late evening of
> June 13, 1996, in their Fall River apartment, within hours of a drug raid at Julius
> Adams's nearby apartment that resulted in the seizure of drugs and the arrest of
> Adams.  After posting bail, Adams returned to his apartment and told his wife,
> Barbara, and the defendant (the defendant resided in the same building as Adams),
> a friend to whom Adams supplied drugs, that he believed that the victims had
> furnished the police with the information used to obtain the search warrant. Adams
> had sold drugs to the victims until April, 1996, when he had an altercation with them.
> After the dispute, the defendant sold drugs to the victims.
>
> After the conversation, the defendant asked Adams if he wanted to do anything
> about the fact that the victims had talked to the police.  Adams responded that he
> did not.  Later that night, Adams was on his porch talking to his brother-in-law, Willie
> Smith, when he saw  the defendant.  The defendant told Adams, "I did it."  Adams
> said, "Did what?"  The defendant responded, "Sonya and David."  The defendant
> was dressed in black nylon sweat pants, a black sweatshirt and white "glove liners"

that were "kind of reddish."  The defendant left, and, approximately fifteen minutes later, Adams saw the defendant leave the apartment building carrying a brown backpack.

On the night of the murders, Lorraine Hamilton sold a revolver to the defendant for fifty dollars.  (footnote omitted)  The defendant told her that handgun was for the people who "snitch[ed]" on Adams's wife.  One week later, the defendant returned to Hamilton stating that the gun did not work properly and only fired off one shot.  Hamilton gave back the defendant's fifty dollars.

At approximately 11:30 p.m. that night, Alvin Patterson, who lived in the apartment across from the victims, awoke to a knocking sound.  He looked through the peephole in his door and saw the defendant knocking on the door to the victims' apartment.  Patterson saw Allen open the door and heard Shurtliff ask, "Who is it?," to which Allen replied, "Curtis." The defendant went into the apartment and the door was closed.  Patterson heard music and then what sounded like a "loud branch" snapping.  The next morning, Patterson and a neighbor discovered the victims' bodies.

At about midnight on June 13, Michelle Freitas, the defendant's former girlfriend, arrived at the defendant's apartment.  About one hour later, the defendant came home.  When the defendant and Freitas went to bed, the defendant knelt down by the side of the bed and prayed.  Freitas had never seen the defendant pray before.  The defendant then lay in bed staring at the ceiling.  Freitas asked him what was wrong.  The defendant stated, "You would feel this way of you [had] killed two people too."  The next morning Freitas saw the defendant putting clothes into a garbage bag.  The defendant told Freitas that she could not stay because people were going to ask her questions and that he was going away for a couple of days.

The next day, June 14, 1996, Kimberly Gaspar picked the defendant up at the boat terminal in Martha's Vineyard.  The defendant told Gaspar that he had murdered two people over drugs.  He stated that he put a pillow over the man's head and shot him, and then strangled the woman.  He also told Gaspar that the woman was difficult to kill and that he was glad that the victims' children did not wake up.  The next day, the defendant met India Rose and told Rose that he had killed two people because one of them had his uncle's (footnote omitted) house raided, and they owed him money.  The defendant also told Rose that he had shot, stabbed, and strangled the victims, but that they just "wouldn't die." (footnote omitted)

The defendant saw Freitas again and told her that, when questioned by the police, she should tell them that he had been with her all night.  The defendant telephoned Sergeant Joseph Castro of the Fall River police department and indicated that he did not want Castro to talk to Freitas.  Freitas was interviewed by the police, and she told the defendant that she had followed the instructions he gave her.

The policed interviewed the victims' children, Kia (then three years old) and Tatiana (then five years old). Tatiana told the police, that, on the night of the killings, two or three people had been inside the apartment. The girls also told the police that a man named Bobby was playing cards at their apartment when they went to bed. Based on this information, the police investigated a man named Bobby Houston, but eliminated him as a suspect. The police also talked to others and learned that the victims had had disputes with drug sellers and owed them money.

On June 27, 1996, the defendant made contact with the Fall River police. After being given Miranda warnings and signing a written Miranda form, the defendant told the police that the victims used to buy drugs through him, and that he bought his drugs from Adams and dealt for Adams. The defendant stated that he went to Martha's Vineyard out of fear of being raided by the police. He indicated his view that more than one person had to have committed the killings because Shurtliff was "a big girl, and . . . it would have taken more than one [person] to hang her." The interrogating officer asked the defendant how he knew that Shurtliff had been "hanged," and the defendant said he had just heard that. The defendant said he would help the police in trying to locate the murderers.

The defendant contended at trial that someone else, probably Adams, had killed the victims. The defendant called an analyst employed by Cellmark Diagnostics, who testified that DNA testing excluded the defendant as a source of DNA obtained from hairs found in Shurtliff's hand. The defendant also called Willie Smith. Smith testified that, during the early morning of June 14, 1996, he saw the defendant while talking to Adams on the porch to Adams' apartment. Smith stated that the porch lights were on, that he had not noticed any blood on the defendant's clothing, and that the defendant was not wearing any gloves. He denied paying attention to the conversation between Adams and the defendant.

The defendant testified. After his trial counsel had him state his name, counsel asked, "Mr. Mitchell, what do you wish to tell these jurors?" The defendant then proceeded to testify at length in a narrative fashion. The defendant recounted his dealings with Adams and recounted events that tended to implicate Adams as the killer. The defendant denied the he had killed the victims, denied that he had prayed while with Freitas, denied the statements Freitas, Gaspar and Rose attributed to him, denied that he had told police not to question Freitas, and denied buying a gun from Hamilton.

The defendant's trial counsel did not argue the defendant's testimony in his closing argument. He emphasized the Commonwealth's high burden of proof and stressed that Adams had a motive to harm the victims. The defendant's trial counsel stated that the defendant was a small time dealer with no motive to kill the victims. He pointed out inconsistencies in Freitas's story to police and suggested that she had implicated the defendant out of fear of Adams. The defendant's trial counsel emphasized the failure of the police seriously to investigate suspects other than the

defendant. He also argued that one of the victims' daughters had identified several people who had been in the victims' apartment, but not the defendant, as the possible killer or killers. He attacked Patterson's credibility based on his criminal record and inconsistent statements to police, and he attacked Adams's credibility, noting that Smith, who had been with Adams when they allegedly met the defendant after the killings, had not observed any blood on the defendant's hands. The defendant's trial counsel further called to the jury's attention the lack of physical evidence tying the defendant to the crimes, and what he considered failures in the police investigation.

With regard to the issue now raised on habeas review, the Supreme Judicial Court found

the following facts:

> After both the Commonwealth and defense had rested, the defendant's trial counsel and the prosecutor approached the bench, where the defendant's trial counsel informed the judge that the defendant now wished to testify. In the absence of an objection by the prosecutor, the judge reopened the evidence to permit the defendant (and Smith, Adams's brother-in-law) to testify. The defendant's trial counsel stated that he had concerns about participating in a fraud on the court and could not reveal more without violating the attorney-client privilege, but that he wanted to put the defendant on the stand, ask him his name, and let him tell his story to the jury. The judge then took a recess to read rule 3.3(e). When the sidebar conference resumed, the defendant's trial counsel indicated that he would remain as counsel in order not to prejudice the defendant. He also assured the judge that he had tried to dissuade the defendant from testifying falsely. The judge instructed the defendant's trial counsel to remain standing during the defendant's narrative testimony on direct and to make objections to the prosecutor's cross-examination one question at a time, as appropriate, keeping in mind that he could not assist the defendant in presenting false testimony.
>
> The trial proceeded in accordance with the judge's instructions. When the defendant finished testifying, his counsel was granted a recess to confer with him. The defendant's trial counsel reported back to the judge that he had "carried out [his] responsibilities under the disciplinary rule." The prosecutor then cross-examined the defendant. The defendant's trial counsel did not argue the defendant's testimony during his closing argument, but argued as summarized above.

*Commonwealth v. Mitchell*, 438 Mass. at 538-543, 781 N.E.2d at 1242-1245, S.A. 3.

## ARGUMENT

### Standard of Review

Habeas corpus review of claims previously adjudicated by state courts is both limited and highly deferential:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which vests "primary responsibility" for evaluating federal law claims raised in criminal trials in the state courts, courts which must be presumed in habeas corpus courts to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24, 27 (2002) (per curiam).  Thus, as the Supreme Court has repeatedly emphasized, it is not sufficient to warrant habeas corpus relief that the state court's decision was erroneous or incorrect.  *Id.* at 27; *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  It is not even sufficient that the state court "failed to apply" Federal law clearly established by the Supreme Court, *Early v. Packer*, 537 U.S. 3, 10 (2002) (per

curiam), or that the state court committed "clear error," or that the reviewing court is of the "firm conviction" that the state court's ruling was erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

Rather, federal courts must decline to intervene to disturb state court judgments unless petitioner demonstrates that his claim falls into one of the narrowly drawn categories set forth in the statute. "Under § 2254(d)(1), the writ may only issue if one of . . . two conditions is satisfied . . . ." *Williams*, 529 U.S. at 412. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. *Id*. at 412-13. The analysis under the "unreasonable application" clause is distinct, and relief is available only if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. To be entitled to relief under the latter clause, the burden is on petitioner to show that the state court decision applied the clearly established law in an "objectively unreasonable" manner. *Id*. at 409-10. Since "[a]pplying a general standard to a specific case can demand a substantial element of judgment," "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004). The clearly established law that is relevant to the analysis under § 2254(d)(1) is limited to the holdings of United States Supreme Court cases extant at the time of the state court decision, and does not include the dicta of such cases. *Id*. at 2147; *Williams*, 529 U.S. at 412.

Factual determinations of state courts are granted similar deference.  To satisfy § 2254(d)(2), a petitioner must show that the state's factual determination was objectively unreasonable.  *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)).  Objective unreasonableness is not merely an incorrect or erroneous decision.  *Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error.  Instead, he must further establish that the state court committed unreasonable error."); *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003) ("federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination").

Moreover, § 2254(d)(2) must be interpreted in conjunction with § 2254(e)(1), which specifies both that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Sanna v. DiPaolo*, 265 F.3d 1, 7.  *See also Miller-El,* 537 U.S. at 341 (noting that to prevail under § 2254(d)(2), habeas petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the court's factual determination was objectively unreasonable).

I.    **THE SUPREME JUDICIAL COURT'S DECISION WAS NOT AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW WHERE PETITIONER'S TRIAL COUNSEL HAD A FIRM BASIS IN FACT TO BELIEVE THAT THE PETITIONER WOULD COMMIT PERJURY AND THEREFORE WAS NOT CONSTITUTIONALLY INEFFECTIVE.**

The petitioner claims that he is entitled to habeas relief because the Supreme Judicial Court's ("SJC") decision was an unreasonable application of Supreme Court law regarding ineffective assistance of counsel as it applies to defense counsel's obligations when he believes that a client will testify falsely.[2]  He also claims that the SJC's determination that the petitioner's counsel had a firm basis in fact for his actions was an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(2).  These claims must fail where the SJC reasonably assessed the situation in determining that counsel was constitutionally effective.

The petitioner alleges that he was deprived of assistance of counsel at critical stages of his trial, when his attorney invoked Mass. Rules of Prof.Conduct, Rule 3.3(e) and allowed him to testify on direct examination in narrative form and then failed to argue his testimony in his closing argument.  In making this claim, the petitioner alleges that his counsel had only a "subjective" belief that he would testify falsely and such a subjective belief was insufficient to justify an exception to the requirement of effective counsel at all critical stages.  *See Nix v. Whiteside*, 475 U.S. 157 (1986).  Therefore, the petitioner

---

[2]  The petitioner does not claim that the SJC's decision was contrary to clearly established Supreme Court law so the respondent will not address this prong of 28 U.S.C. § 2254(d).  The respondent notes that although the SJC did not specifically cite to *Strickland v. Washington*, 466 U.S. 668 (1984), which is the Supreme Court precedent that deals with ineffective assistance of counsel, the court indicated that it examined the petitioner's claim under G.L. c. 278, § 33E, "which is more favorable to a defendant than are the Federal or State constitutional standards."  *Commonwealth v. Curtis*, 438 Mass. at 546 n.6, 781 N.E.2d at 1247 n.6.

argues, since he was deprived of counsel at critical stages of his trial, he need not make a showing of prejudice under ineffective assistance analysis to be entitled to habeas relief. (Pet. memo p. 28).  *See United States v. Cronic*, 466 U.S. 648, 658-659 (1984).   These claims must fail where the state court's implementation of a "firm basis in fact" standard met constitutional concerns and where defense counsel met this standard and therefore acted properly in trying to prevent the defendant from committing perjury.

*Strickland v. Washington,* 466 U.S. 668 (1984) supplies the clearly established federal law governing claims of ineffective assistance of trial counsel. *Strickland* mandates that a defendant who claims that trial counsel's assistance was so ineffective as to require reversal of a conviction must make two showings, on which the defendant bears the burden of proof.  *Strickland,* 466 U.S. at 687.  First, the defendant must show that counsel's performance was constitutionally "deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687.  A court assessing such a challenge "must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and "must indulge a strong presumption that counsel's conduct fell within the range of reasonable professional assistance."  *Strickland,* 466 U.S. at 689-690.

Second, the defendant must show that counsel's deficient performance resulted in "prejudice" to the defense, meaning "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result was reliable." *Strickland,* 466 U.S. at 687.  To establish prejudice, the defendant "must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In making the determination "whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law." *Id.* at 694. The defendant must show *both* deficient performance and prejudice, otherwise "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687.

In *Nix v. Whiteside*, 475 U.S. at 159, the Supreme Court considered whether a criminal defendant's right to assistance of counsel is violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at trial. In *Whiteside*, a defendant charged with murder attempted to establish self defense, initially telling his attorney that although he had not seen a gun in the victim's hand at the time of the killing, he was convinced that the victim had a gun. *Id.* at 160-161. While preparing for trial, the defendant changed his story and said that he had seen "something metallic" in the victim's hand, claiming that "if I don't say I saw a gun, I'm dead." *Id.* at 161. His attorney advised him that if he testified falsely, he would be forced to disclose the perjury to the court and if the defendant insisted on committing perjury, he would seek to withdraw from representing him. *Id.* at 161. The defendant ultimately testified that he knew the victim had a gun and believed the victim was reaching for it. *Id.* at 161. On cross-examination he admitted that he had not actually seen a gun in the victim's hand. *Id.* at 161-162. The jury found the defendant guilty of second-degree murder. *Id.* at 162. The Supreme Court reversed the Eighth Circuit Court of Appeals' granting of the writ of habeas corpus, holding

that defense counsel did not breach any professional duties which would violate the first prong of *Strickland*, noting that although an attorney's duty of confidentiality covers the client's admission of guilt, it "does not extend to a client's announced plans to engage in future criminal conduct." *Id*. at 174. The court also held that counsel's conduct did not establish the prejudice required for the second prong of the *Strickland* inquiry. *Id*. at 174-175. The Court noted that under the *Strickland* standard, "a breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel" and cautioned that courts "must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts." *Id*. at 165.

In *Whiteside*, the Court held that the Sixth Amendment right of a criminal defendant to assistance of counsel is not violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at his trial. *Nix v. Whiteside*, 475 U.S. at 158. Because the question of how certain an attorney must be that his client will testify falsely before he takes action was left open in *Whiteside*, states have adopted various standards, ranging from "good cause to believe the defendant's proposed testimony would be deliberately untruthful," *State v. Hischke*, 639 N.W.2d 6, 10 (Iowa 2002), to knowledge beyond a reasonable doubt," *Shockley v. State*, 565 A.2d 1373, 1379 (Del. 1989). In denying the petitioner's motion for new trial, the trial judge in this case chose to strike a reasonable balance between these extremes, adopting a standard that requires counsel

to have a "firm basis in fact." (S.A. 1, R.A. 139).  The SJC held that this standard satisfied constitutional concerns because "it requires more than mere suspicion or conjecture on the part of counsel, more than a belief and more information than inconsistencies in statements by the defendant or in the evidence."  *Mitchell*, 438 Mass. at 546, 781 N.E.2d at 1247.   The standard approved by the SJC is not an unreasonable application of either *Strickland* or *Whiteside* where it requires that "a lawyer act in good faith based on objective circumstances firmly rooted in fact."  *Id*.   Where the specific standard that applies to situations such as this was left open in *Whiteside*, the SJC reasonably determined that an attorney must have a firm basis in fact before informing the court of his client's possible perjury.  In light of this, the motion judge and the SJC  reasonably concluded that counsel's actions in this case "fell within the range of reasonable professional response to anticipated client perjury" and therefore satisfied both the state's ethical rule and Sixth Amendment constitutional concerns.  *Commonwealth v. Mitchell*, 438 Mass. at 552-553, 781 N.E.2d at 1251. This was an objectively reasonable application of *Strickland*.

The petitioner has also failed to show that counsel's action caused prejudice to his case under the *Strickland* inquiry.  The petitioner claims that he need not show prejudice since he was denied counsel at critical stages of his trial.  However, as set forth in the above analysis, counsel acted appropriately under the circumstances where the petitioner's proposed perjury did not entitle him to the assistance of counsel in furthering that end.  The Supreme Court in *Cronic* agreed that although a criminal defendant is entitled to the effective assistance of counsel, "the Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984).

The cases cited by the petitioner in support of his position (Pet. memo p. 19) are inapposite to this case because they all deal with situations in which a defendant was completely denied counsel at critical stages of trial. *See Herring v. New York*, 422 U.S. 853, 865 (1975) (trial judge denied counsel opportunity to make summation at close of bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612-613 (1972) (law requiring defendant to testify first at trial); *Ferguson v. Georgia*, 365 U.S. 570, 596 (1961) (statute that denied a defendant a right to have his counsel question him violated Fourteenth Amendment). In this case, counsel and the trial judge did all they could to ensure that the petitioner still had the assistance of counsel despite his intention to testify falsely. Counsel did not withdraw from the case, realizing that to do so at the end of a complex murder trial would prejudice the petitioner's case. *Mitchell*, 438 Mass. at 542, 781 N.E.2d at 1245. In light of counsel's concerns regarding his ethical obligations, the judge agreed that the petitioner should testify in narrative form, without being questioned by counsel and that counsel should make objections during cross-examination of the petitioner one question at a time, as appropriate. *Id.* Counsel also gave a closing argument, although he did not include the petitioner's testimony in the summation. *Id.* at 543.

Therefore, counsel's actions did not deprive the petitioner of a fair trial. As the trial judge found, "counsel's representation of the defendant was as a whole zealous and included vigorous cross-examination of witnesses, and an effective closing argument." (S.A. 1:R.A. 151). The trial judge commented at a sidebar following petitioner's narrative testimony that "the jury did not display any alarm or surprise at the defendant's method of testifying" and concluded that, "[i]ndeed, the jury may well have been of a mind that it was

15

ordinary for a defendant, as opposed to other witnesses, to testify in that manner." (S.A. 1:R.A. 152). Although counsel did not argue the petitioner's testimony to the jury, it was clear that they carefully considered it when they asked for a transcript of his testimony (Tr. VIII/3-4) and later were able to listen to an audiotape of the testimony (Tr. VIII/10). Finally, the trial judge found that "defense counsel vigorously argued to the jury various inconsistencies in the government's case, including the lack of physical evidence tying the defendant to the crime and the failure of police to properly investigate other suspects and to perform forensic testing of certain evidence." (S.A. 1:R.A. 153).[3]

The petitioner also claims that the SJC's decision that defense counsel's belief was based on a firm basis in fact was an unreasonable determination of the facts in light of the evidence presented at the motion for new trial. In deciding this claim, the court must keep in mind that the state court's findings of fact are entitled to a presumption of correctness

---

[3] The petitioner also argues that he was denied counsel at the sidebar conference in which his counsel alerted the court to his belief that petitioner would commit perjury. In his appeal to the SJC, the petitioner presented this claim as a violation of his right to be present at all critical stages of trial. (S.A. 1, pp. 37-40). To the extent that the petitioner now raises this as an ineffective assistance claim, it is unexhausted. In any event the error, if any, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abramson*, 507 U.S. 619, 637 (1993) (articulating harmless error standard in federal habeas cases). The trial judge specifically found that although this was a critical stage of the trial when the petitioner should have been present, he would not have accepted the petitioner's assertion that his testimony would be truthful, would not have appointed new counsel, would not have allowed the petitioner to make his own closing argument and would not have reconsidered his previous ruling denying the petitioner an opportunity to make an unsworn statement. *Mitchell*, 438 Mass. at 547, 781 N.E.2d at 1248. *See United States v. Gagnon*, 470 U.S. 522, 526-527 (1985) (a defendant's exclusion from a trial proceeding should be considered in light of the whole record). This finding that the court would have exercised its discretion in the same manner even if petitioner had been present is entitled to a presumption of correctness. 28 U.S.C. § 2254 (e)(1).

that the petitioner must rebut by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

As the SJC pointed out, counsel was faced with more than mere inconsistencies in the

details of a client's version of events.  *Commonwealth v. Mitchell*, 438 Mass. at 547, 781

N.E.2d at 1247.  His client  initially told him that he did not commit the killings and later

admitted that he did.  This was more than a "change in [the] client's recollection" or a case

where an "honest witness [recalls] . . . details that he previously overlooked."  *Nix v.*

*Whiteside*, 475 U.S. at 190.   Counsel's belief that the confession was the truth was

supported by the Commonwealth's evidence, including his incriminating statements and

admissions to others.  In the face of the petitioner's admission to counsel that he had

committed the murders, counsel was justified in believing that his client's later indication

that he wished to testify in his own defense meant that he would testify falsely.  The fact

that evidence provided through discovery further affirmed counsel's belief does not negate

its initial validity.  In light of these facts, the SJC's determination that counsel had a firm

basis in fact for believing that his client would testify falsely was objectively reasonable and

petitioner has not rebutted the state court's findings with clear and convincing evidence.

Where a criminal defendant implicitly expresses the desire to commit perjury, counsel

should not be compelled to assist the defendant in the presentation of such evidence to

the court.  *See Nix v. Whiteside*, 475 U.S. at 173 ("whatever the scope of a constitutional

right to testify, it is elementary that such a right does not extend to testifying falsely").

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

/s Susanne G. Reardon
Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200 ext. 2832
BBO No. 561669

Dated: October 13, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the petitioner's counsel, at the address below on October 13, 2004, by depositing the copy in the office depository for collection and delivery by first-class mail, postage pre-paid, to her as follows:

Leslie W. O'Brien
P.O. Box 426
Winchester, MA 01890

/s Susanne G. Reardon
Susanne G. Reardon
Assistant Attorney General