UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
04-10539-RGS


CURTIS MITCHELL

Petitioner


v.


TIMOTHY HALL

Respondent


REPORT AND RECOMMENDATION ON
PETITION FOR A WRIT OF HABEAS CORPUS

October 27, 2004


COHEN, M.J.

This is a habeas case brought under the provisions of 28 U.S.C. § 2254. The matter was referred to this court for report and recommendation consistent with the provisions of 28 U.S.C. § 636(b) and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts. For the reasons which follow, this court recommends that the district judge to whom this case is assigned dismiss the petition for a writ of habeas corpus for failure to state a claim upon which relief may be granted.

I.    Procedural History

After a jury trial, the petitioner was convicted in the Bristol County Superior Court of murder in the first degree, and was sentenced to a mandatory sentence of imprisonment for life.  He thereafter filed a motion for a new trial.  That motion was denied.  On direct appeal to the Massachusetts Supreme Judicial Court pursuant to the provisions of G.L. c. 278, § 33E, he consolidated his direct appeal with an appeal from the denial of his motion for a new trial.  On January 24, 2004, the Massachusetts Supreme Judicial Court affirmed his convictions. *Commonwealth v. Mitchell*, 438 Mass. 535, 781 N.E.2d 1237 (2003).  His petition for a writ of habeas corpus was filed in this court on or about March 15, 2004.[1]

II.    Underlying Facts

The following evidence - the sufficiency of which is not disputed herein - was presented to the trial court as indicated in the opinion of the Massachusetts Supreme Judicial Court.

The victims, Sonya Shurtliff and David Allen, were murdered in the late evening of June 13, 1996, in their Fall River apartment, within hours of a drug raid at Julius Adams's nearby apartment that resulted in the seizure of drugs and the arrest of Adams.   After posting bail, Adams returned to his apartment and told his wife, Barbara, and the defendant (the defendant resided in the same building as Adams), a friend to whom Adams supplied drugs, that he believed that the victims had furnished the police with the information used to obtain the search warrant.   Adams had sold drugs to the

---

[1]    The respondent does not contend that the petition was filed out of time, or that the claims set forth in the petition were not exhausted in the state courts.

victims until April, 1996, when he had an altercation with them.   After the dispute, the defendant sold drugs to the victims.

After their conversation, the defendant asked Adams if he wanted to do anything about the fact that the victims had talked to the police.   Adams responded that he did not.   Later, that night, Adams was on his porch talking with his brother-in-law, Willie Smith, when he saw the defendant.   The defendant told Adams, "I did it."   Adams said, "Did what?"   The defendant responded, "Sonya and David."   The defendant was dressed in black nylon sweat pants, a black sweatshirt and white "glove liners" that were "kind of reddish."   The defendant left, and, approximately fifteen minutes later, Adams saw the defendant leave the apartment building carrying a brown backpack.

On the night of the murders, Lorraine Hamilton sold a revolver to the defendant for fifty dollars.  The defendant told her the handgun was for the people who "snitch[ed]" on Adams's wife.   One week later, the defendant returned to Hamilton stating that the gun did not work properly and only fired off one shot.   Hamilton gave back the defendant's fifty dollars.

At approximately 11:30 P.M. that night, Alvin Patterson, who lived in an apartment across from the victims, awoke to a knocking sound.   He looked through the peephole in his door and saw the defendant knocking on the door to the victims' apartment.   Patterson saw Allen open the door and heard Shurtliff ask, "Who is it?," to which Allen replied, "Curtis."   The defendant went into the apartment and the door was closed.   Patterson heard music and then what sounded like a "loud branch" snapping. The next morning Patterson and a neighbor discovered the victims' bodies.

At about midnight on June 13, Michelle Freitas, the defendant's former girl friend, arrived at the defendant's apartment.   About one hour later, the defendant came home.   When the defendant and Freitas went to bed, the defendant knelt down by the side of the bed and prayed.   Freitas had never seen the defendant pray before.   The defendant then lay in bed staring at the ceiling.   Freitas asked him what was wrong. The defendant stated, "You would feel this way if you [had] killed two people too."   The next morning, Freitas saw the defendant putting clothes into a garbage bag.   The defendant told Freitas that she could not stay because people were going to ask her questions and that he was going away for a couple of days.

The next day, June 14, 1996, Kimberly Gaspar picked the defendant up at the boat terminal in Martha's Vineyard.   The defendant told Gaspar that he had murdered two people over drugs.   He stated that he put a pillow over the man's head and shot him, and then strangled the woman.   He also told Gaspar that the woman was difficult to kill and that he was glad that the victims' children did not wake up.   The defendant stayed at Gaspar's house that night. The next day, the defendant met India Rose and told Rose that he had killed two people because one of them had his uncle's  house raided, and they owed him money.   The defendant also told Rose that he had shot, stabbed, and strangled the victims, but that they just "wouldn't die."

The defendant's reference to his uncle was to Adams.   There was no testimony, however, at trial, from either Adams or the defendant, that Adams was the defendant's uncle.

The defendant saw Freitas again and told her that, when questioned by the

police, she should tell them that he had been with her all night.   The defendant telephoned Sergeant Joseph Castro of the Fall River police department and indicated that he did not want Castro to talk to Freitas.   Freitas was interviewed by the police, and she told the defendant that she had followed the instructions he gave her.

The police interviewed the victims' children, Kia (then three years old) and Tatiana (then five years old).   Tatiana told the police that, on the night of the killings, two or three people had been inside the apartment.   The girls also told the police that a man named Bobby was playing cards at their apartment when they went to bed. Based on this information, the police investigated a man named Bobby Houston, but eliminated him as a suspect.   The police also talked to others and learned that the victims had had disputes with drug sellers and owed them money.

On June 27, 1996, the defendant made contact with the Fall River police.   After being given Miranda warnings and signing a written Miranda form, the defendant told the police that the victims used to buy drugs through him, and that he bought his drugs from Adams and dealt for Adams.   The defendant stated that he went to Martha's Vineyard out of fear of being raided by the police.   He indicated his view that more than one person had to have committed the killings because Shurtliff was "a big girl, and ... it would have taken more than one [person] to hang her."   The interrogating officer asked the defendant how he knew Shurtliff had been "hanged," and the defendant said he had just heard that.   The defendant said he would help the police in trying to locate the murderers.

The defendant contended at trial that someone else, probably Adams, had killed

the victims.   The defendant called an analyst employed by Cellmark Diagnostics, who

testified that DNA testing excluded the defendant as a source of DNA obtained from

hairs found in Shurtliff's hand.   The defendant also called Willie Smith.   Smith testified

that, during the early morning of June 14, 1996, he saw the defendant while talking to

Adams on the porch to Adams's apartment.  Smith stated that the porch lights were on,

that he had not noticed any blood on the defendant's clothing, and that the defendant

was not wearing any gloves.   He denied paying attention to the conversation between

Adams and the defendant.

III.   <u>Petitioner's Habeas Contention</u>

       In a nutshell, petitioner contends that he was denied effective assistance of

counsel by reason of the fact that his trial counsel, perceiving a fraud upon the court -

*i.e.*, that the petitioner intended to commit perjury when testifying - did not participate in

the direct examination of the petitioner when he [petitioner] testified on his own behalf,

and by reason of the fact that his trial counsel did not, in his closing argument, address

petitioner's testimony at trial.   The context of this contention was set forth by the

Massachusetts Supreme Judicial Court in its opinion affirming his convictions as

follows:

              After both the Commonwealth and defense had rested, the
       defendant's trial counsel and the prosecutor approached the bench,
       where the defendant's trial counsel informed the judge that the defendant
       now wished to testify. In the absence of an objection by the prosecutor,
       the judge reopened the evidence to permit the defendant (and Smith,
       Adams's brother-in-law) to testify. The defendant's trial counsel stated
       that he had concerns about participating in a fraud on the court and could
       not reveal more without violating the attorney-client privilege, but that he
       wanted to put the defendant on the stand, ask him his name, and let him

tell his story to the jury. The judge then took a recess to read rule 3.3(e).[2] When the sidebar conference resumed, the defendant's trial counsel indicated that he would remain as counsel in order not to prejudice the defendant. He also assured the judge that he had tried to dissuade the defendant from testifying falsely. The judge instructed the defendant's trial counsel to remain standing during the defendant's narrative testimony on direct and to make objections to the prosecutor's crossexamination one question at a time, as appropriate, keeping in mind that he could not assist the defendant in presenting false testimony.

The trial proceeded in accordance with the judge's instructions. When the defendant finished testifying, his counsel was granted a recess to confer with him. The defendant's trial counsel reported back to the judge that he had "carried out [his] responsibilities under the disciplinary rule." The prosecutor then crossexamined the defendant. The defendant's trial counsel did not argue the defendant's testimony during his closing argument, but argued as summarized above. The defendant's request to make an unsworn statement to the jury was denied by the judge.

In his motion for a new trial, the defendant argued that his trial counsel did not have an adequate basis to invoke rule 3.3(e), that the judge unconstitutionally applied the rule by failing to conduct a colloquy with him, and that his constitutional rights were violated because he was not present at the sidebar when his trial counsel invoked rule 3.3(e). The defendant also claimed that he should have been afforded the opportunity to be represented by independent counsel, and that he should have been allowed to give an unsworn statement to the jury or to argue his own testimony in closing. In support of his contentions, the defendant offered his affidavit and the affidavit of his trial counsel. In the defendant's

---

2       Paragraph (e) of Rule 3.3 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1383 (1998), entitled, "Candor Toward the Tribunal".

That rule  provides, in pertinent part:

        In a criminal case, defense counsel who knows that the defendant, the client, intends to testify falsely may not aid the client in constructing false testimony, and has a duty strongly to discourage the client from testifying falsely, advising that such a course is unlawful, will have substantial adverse consequences, and should not be followed....  If a criminal trial has commenced and the lawyer discovers that the client intends to testify falsely at trial, the lawyer need not file a motion to withdraw from the case if the lawyer reasonably believes that seeking to withdraw will prejudice the client.   If, during the client's testimony or after the client has testified, the lawyer knows that the client has testified falsely, the lawyer shall call upon the client to rectify the false testimony and, if the client refuses or is unable to do so, the lawyer shall not reveal the false testimony to the tribunal.   In no event may the lawyer examine the client in such a manner as to elicit any testimony from the client that the lawyer knows to be false, and the lawyer shall not argue the probative value of the false testimony in closing argument or in any other proceedings, including appeals." The rule has separate requirements when the issue arises prior to trial.

affidavit, he stated that "[t]he testimony that I gave at trial was true.   I never told [my trial counsel] that I was going to testify falsely and commit perjury."   The defendant's trial counsel, in his affidavit, made the following statements:

>"When I first interviewed [the defendant], he told me he did not kill the victims in this case.

>"Later on in the course of my representation, he told me that he did.   My subjective belief was that this inculpatory story was true.   I had no additional inculpatory information other than that provided by the Commonwealth in discovery and by the witnesses at trial....

>"Prior to the defendant's testimony, I advised him that he was not permitted to give perjured testimony, and that I could not present perjured testimony or argue it.

>"I believed it was perjurious because it contradicted his earlier version of events and was contrary to the evidence provided to me in discovery and presented in the Commonwealth's case.

>"The defendant asked me if he could argue his case in addition to my argument.   I told him that the judge would not allow it and I thought it would hurt rather than help him...."

In his memorandum of decision, the judge addressed the defendant's argument that his trial counsel "lacked a constitutionally sufficient basis for invoking [r]ule 3.3(e)."   The judge noted that the rule applies when counsel "knows" that the defendant intends to commit perjury.   The judge reasoned that the rule does not define the term "knows," but the terminology section of the American Bar Association (ABA) Model Rules of Professional Conduct, on which rule 3.3 is based, states that the term "knows" "denotes actual knowledge of the fact in question.   A person's knowledge may be inferred from circumstances." The judge rejected the defendant's proposed standard-- knowledge beyond a reasonable doubt--concluding that "such a standard is unworkable, as it will be all but impossible, particularly in the crucible of a trial where the evidence is often conflicting and counsel is under enormous stress, for counsel to ever know beyond a reasonable doubt that a defendant's proposed testimony is false."   The judge adopted the "lesser but still demanding requirement that counsel have a 'firm factual basis' for concluding that the defendant will commit perjury" before invoking rule 3.3(e).

The judge rejected the defendant's argument that his trial counsel was required to undertake an independent investigation of the facts before concluding that the defendant's proposed testimony would be perjurious.   The judge concluded that the defendant's trial counsel had a "firm factual basis" supporting his decision.

IV.   <u>Applicable Standard of Review and Controlling Principles</u>

Petitioner contends that the Massachusetts Supreme Judicial Court engaged in an unreasonable application of controlling precedent in affirming his convictions *vis a vis* the claims raised in his petition before this court.

The general controlling principles governing the determination of habeas cases have been spread upon the record by this court on a number of occasions, but are repeated here.

In assessing the federal habeas corpus claims raised by the petitioner, the following general principles apply:

1.    Under the 1996 amendments to the federal habeas statute, the petitioner must show that the state court's decision "was contrary to, or involved an unreasonable application of," Supreme Court precedent.  28 U.S.C. § 2254(d)(1). *E.g.*, *O'Brien v. DuBois*, 145 F.3d 16, 24 (1st Cir. 1998). That is to say, first, the habeas court must determine "whether the Supreme Court has prescribed a rule that governs the petitioner's claim."  And under settled precedent in this Circuit, a "...state court decision is `contrary to' federal law `if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.' *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389

(2000)."  *Santiago v. Spencer*, 346 F.3d 206, 211 (1st Cir. 2003).  If not "contrary to",

then the habeas court must then determine "whether the state court's use of (or failure

to use) existing law in deciding the petitioner's claim involved an 'unreasonable

application' of Supreme Court precedent."

As very recently observed by the Supreme Court of the United States (*Wiggins v.

Smith*, 123 S.Ct. 2527, 2534-2535 (2003)):

> We have made clear that the "unreasonable application" prong of §
> 2254(d)(1) permits a federal habeas court to "grant the writ if the state
> court identifies the correct governing legal principle from this Court's
> decisions but unreasonably applies that principle to the facts" of
> petitioner's case. *Williams v. Taylor*, *supra*, at 413, 120 S.Ct. 1495; *see
> also Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914
> (2002). In other words, a federal court may grant relief when a state court
> has misapplied a "governing legal principle" to "a set of facts different
> from those of the case in which the principle was announced." *Lockyer v.
> Andrade*, 538 U.S. ----, ----, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144
> (2003) (citing *Williams v. Taylor*, *supra*, at 407, 120 S.Ct. 1495). In order
> for a federal court to find a state court's application of our precedent
> "unreasonable," the state court's decision must have been more than
> incorrect or erroneous. *See Lockyer* [*Lockyer v. Andrade*, 123 S.Ct. 1166,
> 1172-1173 (2003)], *supra*, at ----, 123 S.Ct. 1166 (slip op., at 11). The
> state court's application must have been "objectively unreasonable." *See
> Williams v. Taylor*, *supra*, at 409, 120 S.Ct. 1495.

The rationale of that recent holding was more recently echoed and embraced by

our Circuit as well  (*Santiago v. Spencer*, *supra*, at 211-212), to wit:

> A state decision involves an "unreasonable application" if the state
> court identifies the correct governing legal principle from a Supreme Court
> decision, but "unreasonably applies that principle to the facts of the
> prisoner's case." *Williams*, 529 U.S. at 413. The reasonableness test is an
> objective one; in making its decision, a federal court must "ask whether
> the state court's application of clearly established federal law was
> objectively unreasonable." *Williams*, 529 U.S. at 410-11. While
> reasonableness is a fluid concept, we have established some parameters
> for evaluating state court application of federal law. As we held in
> *McCambridge*, "if it is a close question whether the state decision is in

error, then the state decision cannot be an unreasonable application."
*McCambridge*, 303 F.3d at 36. Thus, "some increment of incorrectness
beyond error is required .... The increment need not necessarily be great,
but it must be great enough to make the decision unreasonable in the
independent and objective judgment" of this Court. *Id.* (Emphasis added).

Moreover, in determining the existence *vel non* of prior Supreme Court

precedent, we must look to established precedent - excluding dicta - which existed at

the time of the state court decision being reviewed by the habeas court. *Lockyer v.*

*Andrade*, 123 S.Ct. 1166, 1172-1173 (2003).[3]  And in the last analysis, it can be fairly

said that close calls fall short of warranting habeas relief. *Horton v. Allen*, 370 F.3d 75,

79 (1st Cir. 2004).[4]

V.    Discussion

A.    Ineffective Assistance of Counsel by reason of the fact that trial counsel did
not engage in the direct examination of the petitioner at trial, and did not refer to
petitioner's testimony during closing arguments

In the circumstances, this court finds and concludes that the Massachusetts

---

[3]      There the Court said (*Id.*):

As a threshold matter here, we first decide what constitutes "clearly established Federal
law, as determined by the Supreme Court of the United States." § 2254(d)(1). Andrade relies upon
a series of precedents from this Court--*Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63
L.Ed.2d 382 (1980), *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and
*Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)--that he claims
clearly establish a principle that his sentence is so grossly disproportionate that it violates the
Eighth Amendment. Section 2254(d)(1)'s "clearly established" phrase "refers to the holdings, as
opposed to the dicta, of this Court's decisions as of the time of the relevant state court decision."
*Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In other words,
"clearly established Federal law" under § 2254(d)(1) is the governing legal principle or principles
set forth by the Supreme Court at the time the state court renders its decision. *See id.*, at 405,
413, 120 S.Ct. 1495; *Bell v. Cone*, 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).
(Emphasis added).

[4]      There the Court observed, consistent with standing precedent (*Id.*):

To be an unreasonable application of governing law, the state court's determination must not only
be incorrect but also be objectively unreasonable. *Id.* at 410-11. In other words, if the petition
presents a close call, it must be rejected, even if the state court was wrong. *See Nom v. Spencer*,
337 F.3d 112, 116 (1st Cir.2003). (Emphasis added).

Supreme Judicial Court, in affirming petitioner's convictions *vis a vis* his claim that he received ineffective assistance of counsel, did not engage in an unreasonable application of existing and controlling precedent.

In affirming the convictions, that Court observed, *inter alia* (*Id.* 781 N.E.2d 1246-1251):

> We first address the defendant's contention that the judge applied the wrong standard to inform the word "knows" in rule 3.3(e).  The question what a criminal defense attorney should do when confronted with client perjury at trial has been a subject of considerable debate.  The problem raises both ethical and constitutional concerns.  Defense counsel must furnish zealous advocacy and preserve client confidences, but, at the same time, defense counsel has a duty under rule 3.3(e) to the court.  In addition, the problem has constitutional implications by reason of its potential to deprive a defendant of his right to effective assistance of counsel, and his rights to due process and a fair trial, which include his right to testify in his own defense.
>
> Not unexpectedly, courts have adopted differing standards to determine what an attorney must "know" before concluding that his client's testimony will be perjurious.  The standards include the following: "good cause to believe the defendant's proposed testimony would be deliberately untruthful," *State v. Hischke*, 639 N.W.2d 6, 10 (Iowa 2002); "compelling support," *Sanborn v. State*, 474 So.2d 309, 313 n. 2 (Fla.Dist.Ct.App.1985); "knowledge beyond a reasonable doubt," *Shockley v. State*, 565 A.2d 1373, 1379 (Del.1989);  a "firm factual basis," *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 122 (3d Cir.1977); a "good-faith determination," *People v. Bartee*, 208 Ill.App.3d 105, 108, 153 Ill.Dec. 5, 566 N.E.2d 855, *cert. denied*, 502 U.S. 1014, 112 S.Ct. 661, 116 L.Ed.2d 752 (1991);  and "actual knowledge," *United States v. Del Carpio-Cotrina*, 733 F.Supp. 95, 99 (S.D.Fla.1990) (applying "actual knowledge" standard to require firm factual basis).  The judge properly rejected standards that were too lenient (good cause to believe) or too rigid, particularly the standard sought by the defendant, knowledge beyond a reasonable doubt.  The knowledge beyond a reasonable doubt standard essentially would eviscerate rule 3.3(e).  That standard, as described by one court, is "virtually impossible to satisfy unless the lawyer had a direct confession from his client or personally witnessed the event in question." *State v. Hischke*, supra at 10.  The standard would also tend to compel defense attorneys to remain silent in the face of likely

perjury that a sharp private warning could nip in the bud.   *See Nix v. Whiteside*, 475 U.S. 157, 169, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

The judge correctly settled on the firm basis in fact standard.   This standard satisfies constitutional concerns because it requires more than mere suspicion or conjecture on the part of counsel, more than a belief and more information than inconsistencies in statements by the defendant or in the evidence.   Instead, the standard mandates that a lawyer act in good faith based on objective circumstances firmly rooted in fact.   The lawyer may act on the information he or she possesses, and we decline to impose an independent duty on the part of counsel to investigate because such a duty would be "incompatible with the fiduciary nature of the attorney-client relationship," *United States v. Del Carpio-Cotrina*, *supra* at 99 n. 9, and is unnecessary when an attorney relies, in significant part, on incriminating admissions made by the client.

b. Under the standard articulated, we are satisfied that the defendant's trial counsel, a lawyer with thirty-five years' experience, acted properly under rule 3.3(e).   Contrary to the defendant's contentions, his trial counsel was not faced with mere inconsistent statements.   Rather, the defendant initially told his trial counsel that he did not kill the victims, but later stated that he had murdered them.   The defendant's admission was different in kind from inconsistencies in details, or in statements by a defendant who, under all accounts, consistently denies culpability.   The defendant's trial counsel was not faced with mere discrepancies in details told to him by the defendant at various times;  he was faced with a direct admission from the defendant's own lips combined with substantial evidence produced by the Commonwealth that corroborated the defendant's admission, including the defendant's incriminating conduct and his inculpatory statements to others.   The record amply supports the judge's finding that counsel had a firm basis in objective fact for his good faith determination that the defendant intended to commit perjury.

*     *     *     *     *

d. The judge properly rejected the defendant's claim that rule 3.3(e) was so defectively applied "as to create an actual conflict."   An actual conflict did not exist.   *See Nix v. Whiteside*, *supra* at 176, 106 S.Ct. 988 ("If a 'conflict' between a client's proposal and counsel's ethical obligations gives rise to a presumption that counsel's assistance was prejudicially ineffective, every guilty criminal's conviction would be suspect if the defendant had sought to obtain an acquittal by illegal means.   Can anyone doubt what practices and problems would be spawned by such a rule and what volumes of litigation it would

generate?").   Assuming that a potential for conflict might exist, we agree with the judge that the defendant has made no showing that anything done by his trial counsel caused him prejudice.

    e. It is of no consequence that the defendant's trial counsel informed the judge, in the prosecutor's presence, of his intention to invoke rule 3.3(e).  The defendant's trial counsel did not disclose what expected testimony he believed would be perjurious.   Had the defendant's trial counsel left the prosecutor out of his discussions with the judge, the defendant's subsequent testimony in narrative form likely would have been met with strong objection from the prosecutor, thereby drawing the jury's attention to the procedure.

    f. The narrative form of testimony was properly directed.   This approach was adopted by the ABA in 1971.   See ABA Standards for Criminal Justice 4-7.7 (Approved Draft 1971).   Although the ABA later rejected this approach and currently suggests that the lawyer may examine as to truthful testimony, and although the approach has been criticized, *see United States v. Long*, 857 F.2d 436, 446 n. 7 (8th Cir.1988), "the narrative [approach] continues to be a commonly accepted method of dealing with client perjury," *Shockley v. State*, 565 A.2d 1373, 1380 (Del.1989).   *See Butler v. United States*, 414 A.2d 844, 850 (D.C.1980);  *Sanborn v. State*, 474 So.2d 309, 313 & n. 3 (Fla.Dist.Ct.App.1985);  *People v. Bartee*, 208 Ill.App.3d 105, 108, 153 Ill.Dec. 5, 566 N.E.2d 855 (1991).   The defendant suggests that his trial counsel should have conducted a direct examination with respect to the "non-suspect" portions of his testimony and should also have argued the truthful portions of the defendant's testimony in his closing argument. The former suggestion has been justifiably criticized by the Criminal Justice Section of the ABA:  "[T]his is the worst approach of all....   This [approach] would be far worse for the client than saying nothing, not to mention it would be virtually impossible to control once the client takes the stand.   And what about cross?   How can you possibly prepare your clients for that?   Tell them not to answer any questions that they do not like?"   ABA Criminal Justice Section, Ethical Problems Facing the Criminal Defense Lawyer at 162 (1995). The latter suggestion is impractical, as it may call attention to testimony of the defendant that is not argued by trial counsel, and would likely lead to counsel's making an incoherent final argument.  We shall not impose these requirements on counsel.   Further, to permit the defendant to make an unsworn statement or his own closing argument would allow him to do what rule 3.3(e) prohibits his counsel from doing, arguing perjured testimony to the jury. The defendant's testimony was placed before the jury, and his trial counsel made a persuasive, well-reasoned closing argument to the jury.

-14-

The judge correctly concluded that the defendant was not "denude[d]" of a defense.

*     *     *     *     *

A summary of our disposition of this issue is now in order.  The duties imposed on a criminal defense lawyer (zealous advocacy, preservation of client confidences, avoidance of a conflict of interest) and the constitutional rights granted a defendant (effective legal representation, opportunity to testify in his own defense, right to a fair trial) are circumscribed by what we demand of honorable lawyers and the core principle of our judicial system that seeks to make a trial a search for truth.   The rights of a defendant are not so exclusive that justice can be subrogated to the defendant's perceived interests thereby dismissing or ignoring the interests of victims and the Commonwealth.   Perjury, a most serious common-law felony, is antithetical to these values.   In Massachusetts it is punishable in a noncapital case by up to twenty years' imprisonment, and in a capital case by possible life imprisonment.   G.L. c. 268, § 1.

The standard set forth in rule 3.3(e) "confirm[s] that the legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct;  it specifically ensures that the client may not use false evidence.   This special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice."  (Footnote and citation omitted.)  *Nix v. Whiteside*, supra at 168-169, 106 S.Ct. 988.  The standard in no way abridges constitutional rights of a defendant.   There is no constitutional or permissible right of a defendant to testify falsely.  When defense counsel attempts to persuade a defendant to testify truthfully, counsel is not depriving the defendant of his right to counsel nor the right to testify truthfully.  "In short, the responsibility of an ethical lawyer, as an officer of the court and a key component of a system of justice, dedicated to a search for truth, is essentially the same whether the client announces an intention to bribe or threaten witnesses or jurors or to commit or procure perjury.   No system of justice worthy of the name can tolerate a lesser standard."  *Id.* at 174, 106 S.Ct. 988.

To implement the obligations imposed by rule 3.3(e), when the question of perjured testimony by a defendant arises, we require, as the rule's knowledge element, that the lawyer, before invoking the rule, act in

good faith and have a firm basis in objective fact.   Conjecture or speculation that the defendant intends to testify falsely are not enough. Inconsistencies in the evidence or in the defendant's version of events are also not enough to trigger the rule, even though the inconsistencies, considered in light of the Commonwealth's proof, raise concerns in counsel's mind that the defendant is equivocating and is not an honest person. Similarly, the existence of strong physical and forensic evidence implicating the defendant would not be sufficient.   Counsel can rely on facts made known to him, and is under no duty to conduct an independent investigation.

Once the matter is called to the court's attention, the judge should instruct the lawyer on how to proceed.  (In evaluating the situation, the judge will have to rely on the representations of counsel, which of necessity will be cryptic, because counsel is the one who must make the disclosure while maintaining client confidences and allowing for continued zealous advocacy at trial.)   Before giving instruction, the judge is not required to hold an evidentiary hearing, to appoint an independent lawyer for the defendant, or to conduct a colloquy, although the latter may be appropriate if it appears that the defendant does not clearly understand the situation he has created.   It is acceptable for the defendant to testify by means of an open narrative.   If the defendant, now informed, moves for appointment of new counsel (and, concomitantly, a mistrial), the judge should deny the motions unless the defendant can demonstrate that such motion must be allowed to prevent a miscarriage of justice.   No comprehensive canon can be written on all aspects of practical implementation because each case will have its own idiosyncrasies, and the judge cannot then be informed of the details underlying counsel's invocation of rule 3.3(e).   The judge possesses considerable discretion to vary any of the procedures discussed, if the interests of justice, or effective management of the trial so requires.   As here, full exploration of the ramifications of counsel's invocation of rule 3.3(e) must be postponed until a motion for a new trial, at which time full details may permissibly be revealed.

The judge here anticipated, and followed, these principles (except for the defendant's presence at the sidebar conference), and he properly concluded that the conduct of the defendant's trial counsel fell within the range of reasonable professional response to anticipated client perjury and thus satisfied both rule 3.3(e), and constitutional concerns.   *See* J.W. Hall, Jr., Professional Responsibility of the Criminal Lawyer §§ 26:10-26:14 (2d ed.1996). (Footnotes omitted)

In this case, petitioner cannot fairly contend that this decision of the

Massachusetts Supreme Judicial Court was "contrary to" relevant federal law.  As

indicated above, a "...state court decision is `contrary to' federal law `if the state court

arrives at a conclusion opposite to that reached by [the Supreme Court] on a question

of law or if the state court decides a case differently than [the Supreme Court] has on a

set of materially indistinguishable facts.' *Williams v. Taylor*, 529 U.S. 362, 412-13, 120

S.Ct. 1495, 146 L.Ed.2d 389 (2000)."   That is not this case.  That is to say, this court is

unaware of any Supreme Court precedent[5] (or other federal precedent for that matter)

which holds that - as it was held here - a trial lawyer renders ineffective assistance of

counsel within the meaning of the Sixth Amendment where that lawyer has a firm

factual basis[6] for concluding that his or her client will testify falsely as to a material fact

at trial, and, on account of that, the lawyer declines to participate in the direct

-------------------------------

[5]        And petitioner suggests none.

[6]        It is often said, of course, that one might reap the answer sought by asking the wrong question in the first place.   And that is precisely the case here.

In his petition for a writ of habeas corpus, petitioner states his ground for relief as follows:

Denial of effective assistance of counsel...Based on trial counsel's <u>mere suspicion</u> that the petitioner intended to commit perjury, petitioner's trial counsel refrained from assisting the petitioner during the petitioner's direct examination and further refrained from arguing petitioner's testimony in closing argument. (Emphasis added)

That similar refrain was echoed in the Memorandum in Support of Petition for Writ of Habeas Corpus (# 03, p. 1) filed by counsel in framing the "Question Presented", to wit:

Whether the petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and his rights to due process and a fair trial as guaranteed by the Fourteenth Amendment were violated where, based on trial counsel's representation that he <u>suspected</u> that his client would commit perjury, the trial judge directed counsel to refrain from assisting the petitioner during the petitioner's direct testimony and to refrain from arguing the petitioner's testimony in closing argument. (Emphasis added).

The suggestion that petitioner's trial counsel <u>merely suspected</u> that he (petitioner) would commit perjury at trial is, at once, as wrong as it is misleading.  The trial court and the Massachusetts Supreme Judicial Court concluded that petitioner's trial counsel had a firm factual basis from which to conclude that petitioner, if allowed to testify, would commit perjury during that testimony.  Those state court findings are, as we shall see, entitled to a presumption of correctness, and petitioner has proffered nothing whatsoever of any meaning to the contrary.

examination of the client during such testimony, and declines to refer to that testimony during closing argument.  Insofar as this court can discern,[7] the Supreme Court has addressed a similar issue only once, in *Nix v. Whiteside*, 475 U.S. 157 (1986).[8]  And in that case, one which, perhaps, was far more compelling than the case presented here,[9] the Supreme Court reversed the decision of the Eighth Circuit and concluded that there was <u>no</u> violation of the Sixth Amendment right to counsel.  Petitioner simply has not shown, and cannot show, that the conclusions reached by the Massachusetts Supreme Judicial Court was contrary to federal law within the meaning of *Williams v. Taylor*, *supra*.

Nor can petitioner show that the decisions of the trial judge, in denying the motion for a new trial, and the Massachusetts Supreme Judicial Court in affirming the ruling of the trial judge on this score, constituted an unreasonable application of controlling federal law.  Both the trial judge and the Massachusetts Supreme Judicial Court identified the appropriate controlling principles of law.[10]  Then each court

---

[7]     And, again, petitioner advances nothing further of this score.

[8]     A case to which the Massachusetts Supreme Judicial Court referred on a number of occasions in reaching the conclusions that it did.

[9]     More compelling because in *Nix*, trial counsel dissuaded the defendant from testifying falsely at trial.  In this case, by contrast, petitioner was permitted to spread his perjured observations upon the record before the jury.

[10]     The Massachusetts Supreme Judicial Court identified the controlling Sixth Amendment right to effective assistance of counsel principles set forth by the Supreme Court, to wit:

    With respect to appellate review, we examine the defendant's constitutional claims on effective assistance of counsel under G.L. c. 278, § 33E, which is more favorable to a defendant than are the Federal or State constitutional standards.  *Commonwealth v. Frank*, 433 Mass. 185, 187, 740 N.E.2d 629 (2001).  *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);  *Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974).  *See also Commonwealth v. Fuller*, 394 Mass. 251, 256 n. 3, 475 N.E.2d 381 (1985) ("if the *Saferian* test is met, the Federal test is necessarily met as well").   The § 33E standard governs the

(continued...)

assessed the minutia of those controlling principles.  First each court asked the

question: When does a lawyer "know"[11] that his or her client intends to commit perjury

at trial.  That is to say, what standard applies.  Canvassing all applicable precedent,

both state courts settled on the answer that a lawyer "knows" that a client intends to

commit perjury when the lawyer has a "firm factual basis"[12] for so concluding - a legal

conclusion that petitioner does not now gainsay,[13] and a legal conclusion consistent

with controlling federal law. *E.g.*, *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115,

122 (3d Cir.1977); *United States v. Del Carpio-Cotrina*, 733 F.Supp. 95, 99

(S.D.Fla.1990).[14]

Having then settled on the applicable standard, both courts concluded that

petitioner's trial counsel had a firm factual basis for concluding that petitioner intended

to commit perjury if he testified at trial.  For one thing, in this habeas case, those

---

[10]        (...continued)
defendant's other constitutional contentions as well.

Both the judge and the Massachusetts Supreme Judicial Court also identified and analyzed the principles which are the subset of the *Strickland* principles in the context of a claim such as that presented - those principles having been set forth in *Nix v. Whiteside, supra*.

[11]        In *Nix, supra*, the Court majority assumed that the attorney in that case "knew" that the client intended to commit perjury, but that Court did not assay the question as to the standard to be applied.

[12]        The Massachusetts Supreme Judicial Court referred to that standard as a "firm factual basis" and as a "firm basis in fact", *Commonwealth v. Mitchell, supra*, 781 N.E.2d at 1247.  In summarizing ("A summary of our disposition of this issue is now in order", *Id.* at 1250), that Court summarized that the lawyer must "...act in good faith and have a firm basis in objective fact" in concluding that the defendant intends to commit perjury.

[13]        When before the Massachusetts Supreme Judicial Court, petitioner urged that the standard be "beyond a reasonable doubt" - not "firm factual basis."    That Court rejected petitioner's entreaty to that effect, concluding that knowledge beyond a reasonable doubt standard essentially would eviscerate rule 3.3(e), since a reasonable doubt standard would be"virtually impossible to satisfy unless the lawyer had a direct confession from his client or personally witnessed the event in question.

[14]        Insofar as this court can determine, these cases, *Wilcox* and *Del Carpio-Catrina*, are the only reported federal cases which have discussed the applicable standard.  Both settled for the "firm factual basis" standard.  In these circumstances, it would be foolhardy to suggest that the state courts misconstrued applicable precedent or unreasonably applied controlling federal precedent in also settling on that standard.

findings are entitled to a presumption of correctness - a presumption which petitioner

can only overcome with <u>clear and convincing</u> evidence to the contrary.[15]

In this case, petitioner has fallen far short of showing by <u>clear and convincing</u>

evidence that those findings are incorrect.  We repeat precisely those facts upon which

the trial court and the Massachusetts Supreme Judicial Court relied in reaching these

findings, to wit:

> Under the standard articulated, we are satisfied that the defendant's trial counsel, a lawyer with <u>thirty-five years' experience</u>, acted properly under rule 3.3(e).   Contrary to the defendant's contentions, his trial counsel was not faced with mere inconsistent statements.  <u>Rather, the defendant initially told his trial counsel that he did not kill the victims, but later stated that he had murdered them</u>.   The defendant's admission was different in kind from inconsistencies in details, or in statements by a defendant who, under all accounts, consistently denies culpability.   <u>The defendant's trial counsel was not faced with mere discrepancies in details told to him by the defendant at various times;  he was faced with a direct admission from the defendant's own lips combined with substantial evidence produced by the Commonwealth that corroborated the defendant's admission, including the defendant's incriminating conduct and his inculpatory statements to others.   The record amply supports the judge's finding that counsel had a firm basis in objective fact for his good faith determination that the defendant intended to commit perjury</u>. (Emphasis added).

Against the underlying facts, none of which are disputed by petitioner,[16]

---

[15]     Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a <u>factual issue</u> made by a State court <u>shall be presumed to be correct</u>. <u>The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence</u>. (Emphasis added).

That presumption is applicable, or course, to findings made by the trial court, and is also applicable to findings made by appellate courts. *E.g.*, *Moore v. Ponte*, 186 F.3d 26, 36 (1st Cir. 1999); *Abrams v. Barnett*, 121 F.3d 1036, 1038 (7th Cir. 1999).

[16]     Petitioner disputes what inferences may be drawn from those underlying facts in terms of what trial counsel reasonably believed in good faith, but does not dispute the underlying facts.

petitioner simply has not shown by clear and convincing evidence that those state court findings were incorrect.[17]  Indeed, on the basis of the current record, no other conclusion could have been fairly and reasonably reached.

B.    Absence from the Sidebar Conference

As indicated above, note 6, the ground set forth in the petition for a writ of habeas corpus, as well as the framing of the "Issue Presented" by counsel for petitioner in the Supporting Memorandum, focuses solely on the claim that petitioner was denied effective assistance of counsel by reason of the fact that his trial counsel, perceiving a fraud upon the court - *i.e.*, that the petitioner intended to commit perjury when testifying - did not participate in the direct examination of the petitioner when he [petitioner] testified on his own behalf, and by reason of the fact that his trial counsel did not, in his closing argument, address petitioner's testimony at trial.

In a short diversion in support of that contention, petitioner seemingly allows that his absence from the sidebar conference and/or the absence of yet another attorney on his behalf at which trial counsel advised the trial judge of his belief that the petitioner intended to engage in perjury warrants issuance of the Great Writ as a matter of law.[18]

---

[17]    In suggesting that the state court findings were incorrect, petitioner dwells upon the language that trial counsel used in expressing his conclusion that petitioner would, if he testified, commit perjury.  The language notwithstanding, and the mere fact that trial counsel did not use the magic words, "firm factual basis", the objective facts upon which that conclusion was made were such that no lawyer worth his or her salt would have concluded anything other than that the petitioner intended to commit perjury.

[18]    In the words of petitioner Memorandum in Support of Petition for Writ of Habeas Corpus (# 03, pp. 28-29) :

    In addition, Mitchell was denied <u>counsel</u> at the sidebar conferences at which the judge decided that counsel would not be permitted to assist Mitchell. Mitchell was absent for these conferences, and since his counsel was not representing Mitchell's interests in telling the judge he anticipated that his client would commit perjury, Mitchell was utterly without representation at what can

(continued...)

It is not clear whether petitioner means by this short foray that this absence at the sidebar conference, considered in combination with all that he has otherwise proffered, is yet another arrow in his quiver which proves his point that trial counsel's failure to participate in the direct examination of the petitioner at trial, and trial counsel's failure to allude to petitioner's direct testimony during the course of closing arguments, amounted to a Sixth Amendment violation.  Or whether this absence from the sidebar conference, standing alone, warrants federal habeas relief regardless of prejudice.  If the former, he falls short for the reasons set forth in Part V.A above.

If the latter, he is wrong for a number of reasons.  For one thing, to the extent that petitioner now casts this suggestion in terms of absence of (another) counsel at the sidebar conference, instead of his own absence, that claim was never presented, fairly or otherwise, to the state courts - either as a state law claim or a federal claim.  In his brief before the Massachusetts Supreme Judicial Court,[19] at pages 37-40, the argument focused solely on the ground that <u>petitioner</u> was not present at that sidebar

---

[18] (...continued)
only be viewed as a critical stage of his trial. The trial judge recognized in his rulings on the motion for a new trial that the sidebar conferences were a critical stage of the trial, but held that Mitchell suffered no harm stemming from his absence at the conferences. This was an unreasonable application of Supreme Court precedent, since Mitchell was entitled under *Cronic* to relief without any showing of prejudice.

However, Mitchell did in fact suffer prejudice from the lack of counsel during his direct testimony, and would be entitled on that claim to relief under the *Strickland's* as well as well as *Cronic's*. "Prejudice . . . was inevitable from the use of the narrative form, which "could hardly have failed to convey to the jury the impression that [Mitchell's] counsel attached little significance or credibility to [his] testimony." *State v. Robinson*, 290 N.C. 56, 67, 224 S.E.2d 174 (1976). (Emphasis added).

[19] His brief before the Massachusetts (hereinafter "State Court Brief") is set forth as the first attachment to the Supplemental Answer (# 08).

conference.[20]  He surely is not entitled to habeas relief here on grounds never presented to the state courts in any fashion.

For another, to the extent that petitioner is contending here that <u>his</u> absence from the sidebar conference (as opposed to the absence of other [and new, one would suppose] counsel) warrants habeas relief here,[21] it cannot be reasonably said that controlling <u>federal</u> precedent, then or now, cautions that the United States Constitution mandates the presence of a defendant at a <u>sidebar</u> conference.  To the contrary, insofar as this court can determine,[22] the United States Constitution does not guarantee a defendant's presence at a sidebar conference.  As one court has recently observed (<i>Dickens v. Filion</i>, 2002 WL 31477701 *9 (S.D.N.Y. November 6, 2002)):

> However, " '[f]ederal standards regarding a defendant's presence at a side bar are less stringent than New York's standards." ' <i>McKnight v. Superintendent Albauch</i>, 2000 WL 1072351 at *6 (quoting <i>Nichols v. Kelly</i>, 923 F.Supp. 420, 425 (W.D.N.Y.1996)); <i>accord, e.g.</i>, <i>Bryant v. Bennett</i>, 2001 WL 286776 at *3. "Indeed, the Federal Constitution generally 'does not require a defendant's presence at sidebar conferences." ' <i>McKnight v. Superintendent Albauch</i>, 2000 WL 1072351

---

[20]    In his State Court Brief (p. 2), petitioner stated the terms of this argument as follows:

Whether the violation of <u>defendant's</u> right to be present during that [the sidebar conference ] critical stage of the proceeding where his counsel effectively testified against him by disclosing "suspicion" to the court cannot be harmless error because the defendant was without opportunity to contest allegations of trial counsel directly in conflict with constitutionally protected interests. (Emphasis added).

[21]    And that does <u>not</u> appear to be his contention in his petition before this court.  As indicated above, his argument before this court, relying on Sixth Amendment right to counsel precedent (<i>e.g.</i>, <i>United States v. Chronic</i>, 466 U.S. 648 (1984)), rests exclusively on the ground that petitioner was not represented by other <u>counsel</u> at the relevant sidebar conferences - a claim never presented, fairly or otherwise, to the state courts, and a claim, therefore, not properly before this court.

[22]    And petitioner has proffered nothing on this score - perhaps for the simple reason that he has changed horses and strategy on his way from the state courts to the doorstep of this court..  To be sure, he generally contended before the Massachusetts Supreme Judicial Court that a defendant has some sort of right to be present at critical stages of the proceedings.  But he never addressed the precise issue then raised before that Court - <i>i.e.</i>, whether the laws of the Commonwealth, much less the Constitution and laws of the United States, require the presence of a defendant at a <u>sidebar</u> <u>conference</u>.

at *6 (quoting *Gaiter v. Lord*, 917 F.Supp. at 152); *accord*, *e.g.*, *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir.2000) (noting that the Court has found no case "in which an appellate court has found a structural defect where a defendant was present throughout but unable to hear a circumscribed portion of voir dire, and whose counsel was allowed to consult with him about the limited questioning outside his hearing."), *cert. denied*, 532 U.S. 943, 121 S.Ct. 1405, 1406 (2001); *Persaud v. Mantello*, 99 CV 1861, 2002 WL 1447484 at *2 (E.D.N.Y. July 2, 2002) ("district courts in this circuit have held that there is no right to be present at a sidebar conference during voir dire") (citing cases); *Johnson v. McGinnis*, 99 Civ. 11231, 2001 WL 740727 at *3 (S.D.N.Y. June 29, 2001) ("The right to be present at sidebar during voir dire derives from New York state statutory law. Since a federal court on habeas review is limited to considering only violations of the federal Constitution or federal statutory law, I am procedurally barred from considering this claim.") (citations omitted); *Bryant v. Bennett*, 2001 WL 286776 at *3 (the federal constitution does not require a defendant's presence at a voir dire sidebar); *Benitez v. Senkowski*, 1998 WL 668079 at *8 ("However, there is no Constitutional right to appear at sidebar conferencing for peremptory challenges; at most, there is a more limited right to presence during the formal exercise, in open court, of peremptory jury challenges.") (citing cases), cited with approval in *Cohen v. Senkowski*, 290 F.3d at 490; *James v. Senkowski*, 97 Civ. 3327, 1998 WL 217903 at *8 (S.D.N.Y. Apr.29, 1998) (Cote, D.J. & Peck, M.J.) (" 'there is not now and never has been a right guaranteed in the federal Constitution that a defendant be present at a sidebar voir dire." ').

On the other side of the coin, this court has found only one case, and one case alone, which has held that a defendant's presence at a sidebar conference is required when trial counsel, consistent with his ethical responsibilities, seeks to inform the court that the defendant intends to commit perjury. And that was not a federal case. It was, in fact, this very same case before the Massachusetts Supreme Judicial Court, and, even then, that newly-found right was bottomed exclusively on <u>state</u> law, not federal law.[23]

---

[23]    In reaching that conclusion, that Court referred only to state precedent in support, to wit: *Commonwealth v. L'Abbe*, 421 Mass. 262, 268, 656 N.E.2d 1242 (1995); and *Commonwealth v. Angiulo*, 415 Mass.
(continued...)

And finally, even if some unforeseen and/or undiscovered federal precedent suggests that a defendant should be present at a sidebar conference when trial counsel, consistent with his ethical responsibilities, seeks to inform the court that the defendant intends to commit perjury during the course of testifying, that error, to the extent that it occurred here, was clearly harmless.  On this, the Massachusetts Supreme Judicial Court said (*Commonwealth v. Mitchell*, 781 N.E.2d at 1248):

> The defendant argues that had he been at the sidebar, he would have been able to convince the judge that his testimony would be truthful;  that he would have asked that his trial counsel be discharged and new counsel appointed;  and that he would have asked to make his own closing argument and renewed his request to make an unsworn statement to the jury.
>
> The judge disposed of these contentions by pointing out that he would not have accepted the defendant's assertion that his testimony would be truthful;  would not have allowed the defendant to make his own closing argument;  and would not have reconsidered his previous ruling denying the defendant an opportunity to make an unsworn statement.

If the error was harmless, and it surely was in the circumstances of this case for the reasons set forth by the Massachusetts Supreme Judicial Court, then petitioner simply is not entitled to federal habeas relief, since error, even constitutional error, does not normally warrant reversal on direct review (much less vacating a judgment on collateral review) if the error was harmless.  *Chapman v. California*, 386 U.S. 18 (1967). As observed by one Court canvassing the relevant prodigy spurned by the *Chapman* holding (*Arizona v. Fulminante*, 499 U.S. 279, 306-307 (1991))(Chief Justice Rehnquist, with whom Justice O'Connor joined, Justice Kennedy, Justice Souter, and Justice

---

[23]    (...continued)
502, 530, 615 N.E.2d 155 (1993).

Scalia, delivering the opinion of the court in part, and dissenting in part):

Since this Court's landmark decision in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless. *See*, *e.g.*, *Clemons v. Mississippi*, 494 U.S. 738, 752-754, 110 S.Ct. 1441, 1450-1451, 108 L.Ed.2d 725 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); *Carella v. California*, 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) jury instruction containing an erroneous conclusive presumption); *Pope v. Illinois*, 481 U.S. 497, 501-504, 107 S.Ct. 1918, 1921-1923, 95 L.Ed.2d 439 (1987) (jury instruction misstating an element of the offense); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (jury instruction containing an erroneous rebuttable presumption); *Crane v. Kentucky*, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); *Rushen v. Spain*, 464 U.S. 114, 117-118, and n. 2, 104 S.Ct. 453, 454-455, and n. 2, 78 L.Ed.2d 267 (1983) (denial of a defendant's right to be present at trial); *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause); *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); *Kentucky v. Whorton*, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) (failure to instruct the jury on the presumption of innocence); *Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); *Brown v. United States*, 411 U.S. 223, 231-232, 93 S.Ct. 1565, 1570-1571, 36 L.Ed.2d 208 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (confession obtained in violation of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)); *Chambers v. Maroney*, 399 U.S. 42, 52-53, 90 S.Ct. 1975, 1981-1982, 26 L.Ed.2d 419 (1970)

(admission of evidence obtained in violation of the Fourth Amendment); *Coleman v. Alabama*, 399 U.S. 1, 10-11, 90 S.Ct. 1999, 2003-2004, 26 L.Ed.2d 387 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Confrontation Clause).

Given the obvious harmlessness of the error in the circumstances of this case,[24] that, quite simply, ends the matter.[25]  The fact that petitioner was not present at the sidebar conference does not warrant federal habeas relief.

VI.    Conclusion

For the reasons set forth above, it is clear beyond peradventure that petitioner received a full and fair trial, and was not denied the effective assistance of counsel.   It is clear that the constitution does not provide a defendant with a right to perjure himself at trial, or to insist that trial counsel assist him in that endeavor and undermine the integrity of the judicial processes. *Nix v. Whiteside*, *supra*, at 173.[26]  In this case,

---

[24]    Insofar as this court can determine, petitioner does not gainsay the finding that the error was harmless.  See Memorandum in Support of Petition for Writ of Habeas Corpus (# 03, pp. 28-29).  The only prejudice to which petitioner alludes is the prejudice he perceives by reason of the fact that petitioner's direct testimony was in the narrative form ("'Prejudice....was inevitable from the use of the narrative form...").  But that has nothing to do, insofar as this court can discern, with the nature of the sidebar conference itself.  If petitioner means to suggest now (and he never so suggested the point in his brief before the Massachusetts Supreme Judicial Court) that, had he been present at the sidebar conference, he would have persuaded the trial judge to have been permitted to give his perjurious testimony in the context of questions put to him by his trial counsel in direct examination, that is pure and simple folly.  For if nothing else is clear, it is clear that the trial judge never would have permitted trial counsel to aid and abet the petitioner in his fraud upon the court.

[25]    In his Memorandum in Support of Petition for Writ of Habeas Corpus (# 03, pp. 28-29), petitioner contends that the Supreme Court's holding in *Cronic v. United States*, 466 U.S. 648 (1984), mandates that the Great Writ issue even in the absence of prejudice.  Once again, petitioner misses the mark on this score. Even assuming that the *Cronic* holding can be squared with the holding in *Chapman v. California*, *supra*, and, more importantly, the prodigy of the *Chapman v. California* holding as set forth in the text above, it has no applicability here.  And that is because the *Cronic* holding, to the extent it is still viable, is limited to claims that a defendant was denied the total assistance of counsel at a critical stage of the proceedings.  As indicated above in the text and accompanying notes, *e.g.*, *notes 18*, 20 and 21, a claim that petitioner was denied assistance of counsel at the sidebar was never presented to the state courts, and is not properly before this court for consideration.  And *Cronic*, by its very terms, does not apply to a claim - the only claim properly before this court - that a defendant (as opposed to a defendant's counsel) was denied his presence at a sidebar conference.  In short, petitioner can find no safe haven in *Cronic*.

[26]    "Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely*...the right to counsel includes no right to have a lawyer who will cooperate with planned
(continued...)

counsel for petitioner, faced with a firm factual basis for concluding that the petitioner intended to testify falsely, nevertheless performed admirably, competently, and professionally in the circumstances.[27]  This court accordingly recommends[28] that the district judge to whom this case is assigned dismiss the petition for a writ of habeas corpus for failure to state a claim upon which relief may be granted.

_____
UNITED STATES MAGISTRATE JUDGE

---

[26]      (...continued)
perjury."

[27]      As observed by the Massachusetts Supreme Judicial Court, *Commonwealth v. Mitchell*, 781 N.E.2d at 144:

> The defendant's trial counsel did not argue the defendant's testimony in his closing argument.   He emphasized the Commonwealth's high burden of proof and stressed that Adams had a motive to harm the victims.   The defendant's trial counsel stated that the defendant was a small time dealer with no motive to kill the victims.   He pointed out inconsistencies in Freitas's story to police and suggested that she had implicated the defendant out of fear of Adams.   The defendant's trial counsel emphasized the failure of the police seriously to investigate suspects other than the defendant.   He also argued that one of the victims' daughters had identified several people who had been in the victims' apartment, but not the defendant, as the possible killer or killers.   He attacked Patterson's credibility based on his criminal record and inconsistent statements to police, and he attacked Adams's credibility, noting that Smith, who had been with Adams when they allegedly met the defendant after the killings, had not observed any blood on the defendant's hands.   The defendant's trial counsel further called to the jury's attention the lack of physical evidence tying the defendant to the crimes, and what he considered failures in the police investigation.

[28]      The parties are hereby advised that under the provisions of Rule 72(b) of the Federal Rules of Civil Procedure and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file specific and  written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this rule shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also, Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985).