UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CURTIS MITCHELL,          )
          Petitioner      )
                          )
     v.                   )          No.   04-10539-RGS
                          )
SUPERINTENDENT            )
     TIMOTHY HALL,        )
          Respondent      )

## PETITIONER'S APPLICATION FOR
## CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253, F.R.A.P. 22(b), and Loc. R. 22.1, petitioner Curtis Mitchell, through counsel, hereby applies for a certificate of appealability (COA) with respect to the following issue raised in his petition for a writ of habeas corpus:

Whether the petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment and his rights to due process and a fair trial as guaranteed by the Fourteenth Amendment were violated where, based on trial counsel's representation that he suspected that his client would commit perjury, the trial judge directed counsel to refrain from assisting the petitioner during the petitioner's direct testimony and to refrain from arguing the petitioner's testimony in closing argument.

In support of this application, the petitioner has
attached a copy of his memorandum in support of his
petition for habeas relief.

In further support of this motion, the petitioner
states that he "has made a substantial showing of the
denial of a constitutional right" as required by 28 U.S.C.
2253(c).

## History of Case Relating to COA

Curtis Mitchell was tried on two counts of first-
degree murder. After the prosecutor rested, and before
presenting the defendant's case, defense counsel asked for
a sidebar conference. Defense counsel informed the judge
that he had "suspicions" that Mitchell's testimony might
not be truthful. Counsel further reported that he had
shared his "suspicions" with another judge, believing that
this was required under the disciplinary rules. The judge
responded that he was not aware of any such rule and that
"It doesn't make any sense to me". There is in fact no
such requirement under the applicable rule, Rule 3.3(e) of
the Massachusetts Rules of Professional Conduct.

After reviewing the rule, the judge concluded that
trial counsel could not have read it. Trial counsel went
on to tell the judge that it was his understanding that,
based on his belief that Mitchell's testimony would be

false, he must he must simply ask Mitchell what he wants to tell the jury, then sit down and "keep his derriere in his chair" and provide no further aid to his client. After additional discussion, the judge determined that defense counsel must simply ask Mitchell his name and what he wanted to tell the jury, and then stand silently as Mitchell testified. This procedure was followed, and Mitchell gave his direct testimony in narrative form, without the assistance of counsel.

Mitchell argued in a motion for a new trial, and then in his appeal to the Massachusetts Supreme Judicial Court, that trial counsel's actions in abandoning Mitchell during his direct examination and failing to argue Mitchell's testimony in summation violated his Sixth Amendment right to the effective assistance of counsel as well as his rights to due process and a fair trial. The Massachusetts Supreme Judicial Court (SJC) affirmed the denial of the motion for a new trial in *Commonwealth* v. *Mitchell*, 438 Mass. 535, 781 N.E.2d 1237 (2003). The SJC noted that the issue raised here "has constitutional implications by reason of its potential to deprive a defendant of his right to effective assistance of counsel, and his rights to due process and a fair trial, which include the right to testify in his own defense." *Id.* at 544. After discussing

the various standards that different courts have applied in
determining what level of knowledge an attorney must have
before concluding that the client intends to perjure
himself, the SJC held that the trial judge was correct in
applying the "firm factual basis" standard.  The court
further held that the judge's finding that trial counsel
had such a basis was supported by the record.  Id. at 543-
546.

In his petition for habeas corpus directed to this
Court, Mitchell argued that the Sixth Amendment right to
the effective assistance of counsel is firmly established
by Supreme Court precedent, Gideon v. Wainwright, 372 U.S.
335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Powell v. Alabama,
287 U.S. 45, 57, 53 S.Ct. 55, 59--60, 77 L.Ed. 158 (1932),
that the right applies at all critical stages of trial,
Michigan v. Harvey, 494 U.S. 344, 358 n.4, 110 S.Ct. 1176,
108 L.Ed.2d 293 (1990), and that the SJC's decision
unreasonably applied this clearly-established precedent.[1]
Mitchell further argued that nothing in the Supreme Court's
decision in Nix v. Whiteside, 475 U.S. 157, 106 S.Ct. 988,
89 L.Ed.2d 123 (1986) justified the denial of the right to

---

[1]     Mitchell also argued that the SJC's decision involved
an unreasonable determination of the facts of the case.

counsel in Mitchell's case. The petitioner pressed his
Fourteenth Amendment claims in his petition as well.

This Court's decision dismissing the defendant's
petition was entered on December 7, 2004.

## Argument

To qualify for a COA, the applicant must make "a
substantial showing of the denial of a constitutional
right." 28 U.S.C. § 2253(c)(2). This standard requires a
showing that "reasonable jurists could debate whether ...
the petition should have been resolved in a different
manner or that the issues presented were 'adequate to
deserve encouragement to proceed further.'" *Slack* v.
*McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d
542 (2000), quoting *Barefoot* v. *Estelle*, 463 U.S. 880, 893
n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (internal
quotation marks omitted).

Here, the petitioner has argued that his
constitutional right to the assistance of counsel was
violated, as well as his rights to due process and a
fair trial. This is demonstrably an issue on which
reasonable jurists may differ. More specifically, the
courts can and have differed regarding the correct
standard to be applied before counsel may abandon his
client based on the belief that the client will

perjure himself. See *United States* v. *Long*, 857 F.2d 436, 447 (8th Cir, 1988) (requiring "a clear expression of intent to commit perjury" before counsel can reveal client confidences"); *United States ex rel Wilcox* v. *Johnson*, 555 F.2d 115, 122 (3rd Cir. 1977) (stating that under "firm factual basis" standard "attorney may not volunteer a mere unsubstantiated opinion that his client's protestations of innocence are perjured"); *Doe* v. *Federal Grievance Committee*, 847 F.2d 57, 62-63 (2d Cir. 1988) (stating that "firm factual basis" standard is satisfied when attorney has "actual knowledge" based on client's acknowledgement "that he has perpetrated a fraud upon a tribunal"); *United States* v. *Del Carpio-Cotrina*, 733 F.Supp. 95, 99 (S.D.Fla. 1990) (stating that "actual knowledge standard is necessary to prevent unnecessary disclosure of client confidences and to protect the fiduciary nature of the attorney-client relationship"); *Shockley* v. *State*, 565 A. 2d 1373, 1379 (Del. 1989) (requiring knowledge beyond a reasonable doubt); *Commonwealth* v. *Alderman*, 437 A.2d 36, 39 (Pa. Super. Ct. 1981) (same).

Since Mitchell has made a substantial showing that he was denied his constitutional right to counsel, and since

reasonable jurists could disagree regarding the correct resolution of Mitchell's petition for habeas corpus, the issuance of a certificate of appealability is appropriate. *Slack* v. *McDaniel*, *supra*.

### Conclusion

For the reasons stated, the petitioner respectfully asks that this application be allowed.

> Respectfully submitted
> for the Petitioner,
>
>
> Leslie W. O'Brien
> P.O. Box 426
> Winchester, MA 01890
> (781) 756-0111

### CERTIFICATE OF SERVICE

I, Leslie W. O'Brien, counsel for the petitioner, hereby certify under the penalties of perjury that I have served Assistant Attorney General Susanne G. Reardon with a copy of the foregoing Petitioner's Application for Certificate of Appealability this 28th day of December, 2004, by first class mail.

> Leslie W. O'Brien
> Post Office Box 426
> Winchester, MA 01890
> 781-756-0111

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CURTIS MITCHELL,<br>       Petitioner | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| SUPERINTENDENT<br>       LYNN BISSONETTE | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ATTORNEY GENERAL<br>       THOMAS F. REILLY,<br>       Respondents | ) | |

MEMORANDUM IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

QUESTION PRESENTED

Whether the petitioner's right to the effective
assistance of counsel as guaranteed by the Sixth Amendment
to the United States Constitution and his rights to due
process and a fair trial as guaranteed by the Fourteenth
Amendment were violated where, based on trial counsel's
representation that he suspected that his client would
commit perjury, the trial judge directed counsel to refrain
from assisting the petitioner during the petitioner's
direct testimony and to refrain from arguing the
petitioner's testimony in closing argument.

## PROCEDURAL HISTORY

On September 26, 1996, a Massachusetts grand jury in Bristol County returned indictments charging the petitioner, Curtis Mitchell with two counts of murder.  The case was tried in December of 1998 before the Honorable Raymond J. Brassard and a jury.  On December 17, 1998, the jury returned verdicts of guilty of first-degree murder on both counts.  Mitchell received a life sentence on each count, to run concurrently.

On August 17, 2000, Mitchell moved for a new trial claiming that he was denied the effective assistance of counsel and due process for the reasons argued here and also based on trial counsel's failure to conduct an adequate pretrial investigation.  The motion was denied. Mitchell appealed on the same grounds to the Massachusetts Supreme Judicial Court.  In addition, Mitchell argued on appeal that his right to be present at all critical stages of the trial was violated, and that a motion to dismiss the indictments based on the prosecution's loss of potentially exculpatory evidence was erroneously denied.  The court affirmed his convictions on January 24, 2003.  *Commonwealth v. Mitchell*, 438 Mass. 535, 781 N.E.2d 1237 (2003). Mitchell then petitioned the Supreme Court for certiorari, which the court denied on June 2, 2003.  *Mitchell* v.

*Massachusetts*, \_\_\_ U.S. \_\_\_, 123 S.Ct. 2253, 156 L.Ed. 118 (2003).

## STATEMENT OF FACTS

### I.   The Commonwealth's case.

On the morning of June 14, 1996, officers of the Fall River Police Department responded to a call to an apartment building at 101 Baker Street (Tr. II/208). The officers entered the apartment of Sonia Shurtliff and her boyfriend, David Allen. There the officers observed Shurtliff lying on a couch, naked from the waist down, with a lamp cord wrapped around her neck and stab wounds to her chest (Tr. II/209-210; III/135). Allen was lying on another couch with a pillow over his face and blood covering his chest (Tr. II/209-210; III/135-136; IV/125).

A bloody steak knife and a small revolver lay on the floor a few feet from Allen's body (Tr. III/137). The revolver contained two discharged cartridge casings and four live rounds. Between the two discharged casings was a live cartridge, indicating that the gun had misfired (Tr. V/20). Neither the gun nor the knife yielded identifiable fingerprints (Tr. III/148; IV/105, 111-113).

At autopsy the medical examiner determined that Sonia Shurtliff had sustained a gunshot wound to the head, and twenty-six stab wounds or cuts to her chest, jaw, neck and

face (Tr. IV/144-146).  Shurtliff had also been strangled
with a ligature (Tr. IV/147-149).  David Allen died from a
gunshot wound to his head and multiple stab wounds (Tr.
IV/120-126, 130, 138).

In the course of their investigation, the Fall River
police and State police identified numerous suspects,
including one of the prosecution's principal witnesses,
Julius Adams (Tr. III/168-169).  Adams and Mitchell lived
on separate floors of the same building at 1091 Rodman
Street (Tr. II/76, 115).[1]  Both sold drugs, and Adams was
Mitchell's supplier (Tr. II/110,116, 136-138; V/117-118).
Adams and Mitchell both supplied drugs to Shurtliff and
Allen (Tr. II/110, 142; V/116-117).

Three days before she was murdered, Shurtliff reported
to police that she had had a dispute with Adams, and that
Adams punched her in the face (II/54-56).  She further
reported that when she went to Adams's house with Allen on
the same day, another physical confrontation ensued, and
Adams's wife Barbara struck Shurtliff in the face with a
cell phone (Tr. II/56-57).  When Shurtliff made these
complaints, she also made a point of telling Officer David
Lafleur that Adams was a drug dealer (Tr. II/57-58).

---

[1]     101 Baker Street, where the victims lived, is visible
from 1091 Rodman Street (Tr. II/110,116, 136-138; V/117-
118).

Lafleur relayed the information from Shurtliff to Officer Joseph Donnelly of the Fall River police vice squad (Tr. II/58-59). On June 13, 1996, Donnelly executed a search warrant at Julius Adams's home (Tr. II/76). Donnelly testified that it was not Shurtliff's information that prompted him to obtain the warrant (Tr. II/80-81). Police seized drugs from Adams's home, and charged him with trafficking in cocaine (Tr. II/76-80).[2] Adams was released on bail shortly after his arrest, just hours before the murders (Tr. II/109).

Adams testified that he believed that Shurtliff and Allen had informed on him and were responsible for the raid on his apartment (Tr. II/110). He further testified that, in the hours after the raid, Mitchell asked Adams if he wanted anything done about it (Tr. II/118). According to Adams, he told Mitchell that he would handle the problem himself (Tr. II/118-119). Adams claimed that at around midnight of the same day he saw Mitchell coming from the direction of the victims' apartment and that Mitchell, who was wearing gloves with red stains, admitted to killing Shurtliff and Allen (Tr. II/119-122, 124). Adams's brother-in-law, Willie Smith, testified that he was present

---

[2]     Adams later pleaded guilty and received a prison sentence on the drug charges (Tr. II/123).

at the time and saw Mitchell, but did not hear Mitchell make any admission and saw no stained gloves (Tr. VI/28-29). Smith did not see the direction from which Mitchell came (Tr. VI/27-29).

Other suspects identified by investigators included David Elmes, Michael Burdette, Derek Duchaine, and Roy Carreiro, all of whom had drug-related disputes with the victims (Tr. III/165-170; IV/54, 61-63; V/125-127). In addition, Tatiana Allen, the older of the victims' two young daughters, named several persons as having been in the apartment on the night of the murders, but did not name Mitchell. At various points in time Tatiana, who was five years old, mentioned the names Bobby, Mike, Barbara and Stephanie (Tr. IV/53-55; 65-66).

No physical evidence of any kind tied Mitchell to the murders of Shurtliff and Allen (Tr. IV/177). Instead, the case against Mitchell consisted of the testimony of witnesses who claimed that Mitchell admitted to the murders, and a witness who claimed to have seen Mitchell enter the victims' apartment on the night of the murders.

Michelle Freitas, Mitchell's girlfriend, testified that she saw Mitchell kneel and pray beside their bed on the night of the murders. When she asked him what was wrong, Mitchell said, "You would feel this way if you

killed two people too" (Tr. III/26). Freitas testified that she told police on two occasions that Mitchell had been with her on the night of the murders (Tr. III/45, 48). Freitas later changed her story and said that Mitchell admitted to the killings (Tr. III/49).[3] She claimed that she lied initially because Mitchell had frightened her into giving him an alibi (Tr. III/41, 79).

A young woman named Kimberly Gaspar testified that Mitchell came to Martha's Vineyard and met her on the day following the murders. According to Gaspar, Mitchell admitted to her that he killed two people (Tr. III/94, 97-98). On the following day, Mitchell met another young woman he knew named India Rose on the beach at Martha's Vineyard. Rose testified that Mitchell told her that he killed "two guys" after they gave police information that led to a raid on his uncle's house (Tr. III/111-113).

The witness whose testimony placed Mitchell at the scene of the crime was Alvin Patterson, the victims' neighbor (Tr. II/162-165). Patterson admitted on the stand to having an extensive, violent criminal record, including convictions for rape and assault and battery by means of a

---

[3]    Freitas changed her story on the day she was arrested and charged as an accessory after the fact. She testified, however, that she knew she was going to be charged before she changed her story (Tr. III/49).

dangerous weapon (Tr. II/173-174). When Patterson first spoke to police, he said he did not hear or see anything on the night of the murders (Tr. II/175). Later, Patterson reported that he looked through the peephole of his apartment door and saw Mitchell being admitted to the victims' apartment (Tr. II/163-165; 175-176).

A woman named Lorraine Hamilton testified that Mitchell came to her home on the evening of the murders and bought a gun from her for fifty dollars (Tr. IV/39). Hamilton was shown the gun that was recovered from the victims' apartment and testified that it looked "something like" the gun she sold to Mitchell (Tr. V/96). She further testified that Mitchell told her the gun was "for the people who snitch [sic] on Barbara," meaning Julius Adams's wife (Tr. V/99). Hamilton initially described Julius and Barbara Adams as her friends, but then admitted that they were her drug suppliers (V/99, 101-103).

II.  The Defendant's case.

Mitchell testified without benefit of counsel, under the circumstances detailed below. The substance of his testimony was as follows:

Mitchell was present at the time of the drug raid on Adams's apartment at 101 Rodman Street and was told by Adams's wife that Mitchell's apartment, in the same

building, would be next (Tr. VI/32-36). When Adams
returned to Rodman Street following his arrest, he spoke
with Mitchell and expressed anger concerning the raid and
its consequences (Tr. VI/36-37). Adams said that the
victims "need to feel what it's like to lose something"
(Tr. VI/36-37). Mitchell accompanied Adams on some
errands, first stopping at Adams's mother-in-law's home to
get some money (Tr. VI/38). Adams suggested that they
should start selling drugs from Mitchell's apartment (Tr.
VI/38-39). Mitchell later decided to remove the drugs from
his apartment and leave them at his cousin's home (Tr.
VI/40). Mitchell left for Martha's Vineyard the following
day, but returned to Fall River when he learned that the
police wished to speak with him (Tr. VI/42-43, 47-48).
Mitchell testified that he did not kill Sonia Shurtliff and
David Allen (Tr. VI/50).

III. Actions of trial counsel.

On the fifth day of trial, the Commonwealth rested
(Tr. V/142). The defense then did the same, not having
called any witnesses (Tr. V/164). On the next day,
however, the trial judge permitted the defendant to reopen
his case to call Willie Smith and the defendant himself
(Tr. VI/5). Immediately following this ruling, defense
counsel asked for a sidebar conference (Tr. VI/5). Defense

counsel informed the judge that he had "suspicions" that
Mitchell's testimony might not be truthful (Tr. VI/6).
Counsel further reported that he had shared his
"suspicions" with another judge, believing that this was
required under the disciplinary rules (Tr. VI/6).   The
judge responded that he was not aware of any such rule and
that "It doesn't make any sense to me" (Tr. VI/6).   There
is in fact no such requirement under the applicable rule,
Rule 3.3(e) of the Massachusetts Rules of Professional
Conduct, which reads as follows:

> (e) In a criminal case, defense counsel who
> knows that the defendant, the client, intends to
> testify falsely may not aid the client in
> constructing false testimony, and has a duty
> strongly to discourage the client from testifying
> falsely, advising that such a course is unlawful,
> will have substantial adverse consequences, and
> should not be followed. If a lawyer discovers
> this intention before accepting the
> representation of the client, the lawyer shall
> not accept the representation; if the lawyer
> discovers this intention before trial, the lawyer
> shall seek to withdraw from the representation,
> requesting any required permission. Disclosure of
> privileged or prejudicial information shall be
> made only to the extent necessary to effect the
> withdrawal. If disclosure of privileged or
> prejudicial information is necessary, the lawyer
> shall make an application to withdraw ex parte to
> a judge other than the judge who will preside at
> the trial and shall seek to be heard in camera
> and have the record of the proceeding, except for
> an order granting leave to withdraw, impounded.
> If the lawyer is unable to obtain the required
> permission to withdraw, the lawyer may not
> prevent the client from testifying. If a criminal
> trial has commenced and the lawyer discovers that

the client intends to testify falsely at trial,
the lawyer need not file a motion to withdraw
from the case if the lawyer reasonably believes
that seeking to withdraw will prejudice the
client. If, during the client's testimony or
after the client has testified, the lawyer knows
that the client has testified falsely, the lawyer
shall call upon the client to rectify the false
testimony and, if the client refuses or is unable
to do so, the lawyer shall not reveal the false
testimony to the tribunal. In no event may the
lawyer examine the client in such a manner as to
elicit any testimony from the client the lawyer
knows to be false, and the lawyer shall not argue
the probative value of the false testimony in
closing argument or in any other proceedings,
including appeals.

The comments corresponding to the rule read as

follows:

[7] In the defense of a criminally accused, the
lawyer's duty to disclose the client's intent to
commit perjury or offer of perjured testimony is
complicated by state and federal constitutional
provisions relating to due process, right to
counsel, and privileged communications between
lawyer and client. While there has been intense
debate over a lawyer's duty in such situations in
criminal cases, this rule proposes to accommodate
these special constitutional concerns in a
criminal case by providing specific procedures
and restrictions to be followed in the rare
situations in which the client states his
intention to, or does, offer testimony the lawyer
knows to be perjured in a criminal trial.
[8] In such cases, it is the clear duty of the
lawyer first to seek to persuade the client to
refrain from testifying perjuriously. That
persuasion should include, at a minimum, advising
the client that such a course of action is
unlawful, may have substantial adverse
consequences, and should not be followed. If that
persuasion fails, and the lawyer has not yet
accepted the case, the lawyer must not agree to
the representation. If the lawyer learns of this

12

intention after the lawyer has accepted the
representation of the client, but before trial,
and is unable to dissuade the client of his or
her intention to commit perjury, the lawyer must
seek to withdraw from the representation. The
lawyer must request the required permission to
withdraw from the case by making an application
ex parte before a judge other than the judge who
will preside at the trial. The lawyer must
request that the hearing on this motion to
withdraw be heard in camera, and that the record
of the proceedings, except for an order granting
a motion to withdraw, be impounded.
[9] Once the trial has begun, the lawyer may seek
to withdraw from the representation but no longer
has an obligation to withdraw if the lawyer
reasonably believes that to do so would prejudice
the client. If the lawyer learns of the client's
intention to commit perjury during the trial, and
is unable to dissuade the client from testifying
falsely, the lawyer may not stand in the way of
the client's absolute right to take the stand and
testify. If, during a trial, the lawyer knows
that his or her client, while testifying, has
made a perjured statement, and the lawyer
reasonably believes that any immediate action
taken by the lawyer will prejudice the client,
the lawyer should wait until the first
appropriate moment in the trial and then attempt
to persuade the client confidentially to correct
the perjury.
[10] In any of these circumstances, if the lawyer
is unable to convince the client to correct the
perjury, the lawyer must not assist the client in
presenting the perjured testimony and must not
argue the false testimony to a judge, or jury or
appellate court as true or worthy of belief.
Except as provided in this rule, the lawyer may
not reveal to the court that the client intends
to perjure or has perjured himself or herself in
a criminal trial.

After reviewing the rule, the judge concluded that

trial counsel could not have read it (Tr. VI/8).  Trial

counsel went on to tell the judge that it was his

understanding that, based on his belief that Mitchell's testimony would be false, he must he must simply ask Mitchell what he wants to tell the jury, then sit down and "keep his derriere in his chair" and provide no further aid to his client (Tr. VI/12). After additional discussion, the judge determined that defense counsel must simply ask Mitchell his name and what he wanted to tell the jury, and then stand silently as Mitchell testified (Tr. VI/12-14). This procedure was followed, and Mitchell gave his direct testimony in narrative form, without the assistance of counsel (Tr. VI/32-52).

IV.   The Massachusetts courts' decisions.

Mitchell was represented by counsel other than trial counsel for his motion for a new trial and on appeal. In the motion for a new trial Mitchell argued, inter alia, that trial counsel's actions in abandoning Mitchell during his direct examination and failing to argue Mitchell's testimony in summation violated his Sixth Amendment right to the effective assistance of counsel as well as his rights to due process and a fair trial. Mitchell further argued that such actions by counsel could not be justified on the ground of ethical considerations unless counsel believed beyond a reasonable doubt that his client intended to commit perjury. Appended to the motion for a new trial